### DAVID B. TEEM V. THE STATE.

No. 3933. Decided March 1, 1916.

Rehearing denied March 22, 1916.

**1.—Illegally Practicing Medicine—Indictment—Precedent.**

Where, upon trial of illegally practicing medicine, the indictment substantially followed the statutes and approved precedent, the same was sufficient.

**2.—Same—Constitutional Law—Validity of Legislative Act.**

The Act of the Legislature of April 17, 1907, page 224, with reference to the practice of medicine, etc., and which was again carried forward in the Revised Civil Statutes, articles 5733-5746, and the Penal Code, articles 750-756, is constitutional. Following Collins v. State, 223 U. S., 288.

**3.—Same—Chiropractic Doctor—Statutes Construed—Words and Phrases.**

Where, upon trial of illegally practicing medicine, the defendant contended that he did not violate the law, because he was not a practitioner of medicine and, therefore, did not have to record his license, and that he was merely practicing a new science whereby he would remove the cause of the trouble from a person and the vital forces of his body would then assert themselves and heal the patient; in other words, he claimed to be a chiropractic doctor, and therefore not embraced within the purview of said Medical Practice Act, but the evidence showed that he treated the sick for different ailments and charged each of them for such treatment, which they paid, it did not matter whether he called this work upon the patients a treatment of them, or an adjustment or a displacement of them, as the substitution of other words for those used in the statutes or refraining from using them cannot change the law, and the conviction is sustained.

**4.—Same—Advertisement—Attempt to Evade the Law.**

Where, upon trial of illegally practicing medicine, the defendant in his advertisement proclaimed that he was not a surgeon and did not treat disease, etc., but removed the cause of the trouble, etc., by adjusting and not treating the

patient, this was clearly an attempt to evade the law and did not change the fact that he did treat the sick and charged and collected fees therefor.

**5.—Same—Rule Stated—Statutes Construed—Chiropractor.**

No one has an inalienable right to follow the occupation of practicing medicine or treating disease for pay, and the State may constitutionally prescribe conditions to such practice considered by it to be necessary or useful to secure competency in those who follow it, and it does not matter to what special school of medicine or healing he belongs, and a chiropractor who professes to help certain ailments by scientific manipulation affecting the nerve centers is not excepted. Following Collins v. State, supra.

**6.—Same—Charge of Court—Bill of Exceptions.**

Where all the requested charges save one were not reserved in the bill of exceptions in the proper way they cannot be reviewed; besides they did not present reversible error.

**7.—Same—Charge of Court—Burden of Proof—Requested Charges—Misdemeanor.**

Where, upon trial of illegally practicing medicine, defendant objected to one portion of the charge of the court because it imposed upon defendant the burden of establishing his innocence, but requested no charge on this point, there was no reversible error, under article 739, Penal Code, which does not require the trial judge to give any charge in a misdemeanor case, and where he does so charge the matter can not be reviewed without an exception specifically pointing out the objection and without requesting a correct charge covering the alleged error and reserving an exception to the overruling of the same. Following Brown v. State, 73 Texas Crim. Rep., 571, and other cases.

**8.—Same—Argument of Counsel.**

Where the argument of State's counsel was a reply to that of defendant's counsel, and at any event was legitimate, there was no reversible error.

**9.—Same—Motion for Rehearing—Validity of Law—Constitutional Law.**

Where, upon motion for rehearing, appellant contended for the first time that he was convicted under what purported to be the Medical Practice Act, but that this Act was not in fact and in reality the law passed by the Legislature, but that the first Act during the session of the Thirtieth Legislature was in fact the law legally passed by the Legislature, and the Senate and House Journal showed that the latter was legally passed by both houses and sent to the Governor for approval, with whom it remained some eight days and by operation of the Constitution became the law of the land, and that the Legislature had no right to recall said Act, and the Governor had no constitutional right to return said Act to the Legislature, and that the amended Act and its return to the Governor was not constitutionally authorized and did not become the law of the land, and that the defendant could not be convicted under said latter Act. Held, that said Act having been amended and passed, enrolled and signed, approved by the Governor and delivered to the Secretary of State, where it appears in the archives of his office and was duly printed and promulgated as the Act of the Legislature, it constitutes a record which is conclusive evidence of the passage of said Act.

**10.—Same—Practice on Appeal—Evidence—Record.**

Where the validity of the General Medical Practice Act, under which defendant was prosecuted and convicted for illegally practicing medicine, was attacked by appellant for the first time in his motion for rehearing in this court because said Act was not legally passed by the Legislature, and none of the proceedings of either house of said Legislature, or the action of the Governor with reference thereto was offered in evidence in any way upon defendant's trial, and the only exception thereto was contained in appellant's motion for rehearing simply signed by his attorney, the matter was hardly in proper shape to be reviewed.

**11.—Same—Validity of Legislative Act—Constitutional Law—Rule Stated.**

Where an Act has been passed by the Legislature, signed by the proper officers of each house, approved by the Governor and filed in the office of the Secretary of State, it constitutes a record which is conclusive evidence of the passage of the Act as enrolled, and neither the Journals kept by the Legislature nor the bill as originally introduced, nor the amendment attached to it, nor parol evidence can be received in order to show that an Act of the Legislature, properly enrolled, authenticated and deposited with the Secretary of State, did not become the law, and the court can not look beyond this. Following Usener v. State, 8 Texas Crim. App., 177. Distinguishing Wolfe v. McCaull, 76 Va., 876, and other cases. But even when considering such Journals it appears that the Act under which defendant was convicted was constitutionally enacted.

**12.—Same—Recall of Legislative Act—Governor—Constitutional Law.**

There is nothing in the Constitution which either directly or indirectly prohibits the Governor, before he acts on a bill passed by the Legislature and submitted to him for approval, from returning the same to either house of the Legislature at its request, and where the Journals of both houses of the Legislature show that they requested the Governor to return the original bill, as first passed, to the Senate for correcting and amending the same, before he had in any way acted thereon and before the time given him by the Constitution to act therein had expired, and that he promptly complied with their request, and that thereupon that bill was returned to the Senate, which properly sent it to the House and which then rescinded all of its previous action in passing the bill, and then in regular order amended and properly passed the bill as amended, afterwards returning it to the Senate, which accepted the amendments of the House and then properly passed and enrolled the bill, which was then properly signed by the President of the Senate and the Speaker of the House in open session, and properly entered in the Journals and delivered to the Governor, approved by him, delivered to the Secretary of State, and by him published as a law, the same was constitutionally enacted.

**13.—Same—Constitutional Law—Rules Governing Proceedings of Legislature—Recall of Bill—Parliamentary Law.**

Under the Constitution each house of the Legislature has the right, power and authority to determine the rules of its own proceedings, and there is nothing in the rules so adopted which either directly or indirectly prevented either house from recalling from the Governor a bill which they had passed and placed in his hands for his action, for correcting and amending it before he had acted thereon, and in such case the general parliamentary practice must be followed which establishes the rule to make such recall from the Governor.

**14.—Same—Veto Power—Legislative Function—Rule Stated.**

The veto power of the Governor when exercised is a legislative and not an executive function, and the Governor, in connection with both houses of the Legislature, when they request the return from him of a bill, and he does so before acting thereon, are acting in a legislative capacity and not in an executive function. Following Fulmore v. Lane, 104 Texas, 499, and other cases. Distinguishing Wolfe v. McCaull, supra.

**15.—Same—Statutes Construed—Revised Civil Statutes—Penal Code.**

But even if it could be considered that this court was in error, the fact that the Thirty-second Legislature, at its regular session, duly enacted and passed said Medical Practice Act in adopting the Revised Civil Statutes and Penal Code, and re-enacted said law, it thereby became the law of the land, and the defendant was rightly convicted thereunder.

**16.—Same—Statutes Construed.**

Again, even if appellant's contention that said Act was not legally passed,

but that the first Act became the law, it would be of no avail to him as the law under which he was convicted is the same in both Acts.

Appeal from the County Court of Grayson. Tried below before the Hon. Dayton B. Steed.

Appeal from a conviction of illegally practicing medicine; penalty, a fine of $100 and six days confinement in the county jail.

The opinion states the case.

*George S. Evans* and *Freeman & Batsell,* for appellant.—On question of insufficiency of the evidence: Ex parte Muckenfuss, 52 Texas Crim. Rep., 467, 107 S. W. Rep., 1131.

On question of refusing special instructions submitting the issue that the defendant did not come within the scope of the general Medical Practice Act: Moore v. State, 59 Texas Crim. Rep., 361, 128 S. W. Rep., 1115; Roquemore v. State, 59 Texas Crim. Rep., 568, 129 S. W. Rep., 1120; De Rossett v. State, 74 Texas Crim. Rep., 235, 168 S. W. Rep., 531; Hahn v. State, 73 Texas Crim. Rep., 409, 165 S. W. Rep., 218.

On question of insufficiency of indictment and proof: Parshall v. State, 62 Texas Crim. Rep., 177; Ex parte Vaccarezza, 52 id., 105; Ex parte Woods, 52 id., 575, and cases supra.

On question of invalidity of statute: Wolfe v. McCaull, 76 Va., 876; Pickle v. McCall, 86 Texas, 212, 24 S. W. Rep., 265.

*C. C. McDonald,* Assistant Attorney General, for the State.—Cited Newman v. State, 58 Texas Crim. Rep., 223; Newman v. State, 61 id., 338; Collins v. State, 57 Texas Crim. Rep., 2; Singh v. State, 66 Texas Crim. Rep., 156, 146 S. W. Rep., 891.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of illegally practicing medicine, and his punishment assessed at a fine of $100 and six days confinement in jail.

The record is quite voluminous. In addition, appellant has a printed brief of more than 100 pages. The brief, however, is largely made up of copies from the record. We have given the record and brief, as well as the oral arguments of the appellant's able attorneys when the cause was submitted, due and full consideration.

The indictment is substantially, if not literally in the form laid down in Judge Willson's Crim. Forms (4th ed.), No. 343, page 187, and also follows the statute prescribing the offense, and is valid, as has many times been held by this court. The trial judge correctly overruled appellant's motion in arrest of judgment.

Our Constitution (sec. 31, art. 16) is: "The Legislature may pass laws prescribing the qualifications of practitioners of medicine in this State and to punish persons for malpractice, but no preference shall ever be given by law to any schools of medicine."

By an Act approved April 17, 1907, page 224, the Legislature, in obedience to said constitutional provision and in compliance therewith, enacted a comprehensive law on the subject. The different sections of

that Act are embraced in the Revised Civil Statutes as articles 5733 to 5746, and most of them—all of which are necessary—also in our Penal Code, as articles 750 to 756. This Act of the Legislature has expressly been held constitutional by the United States Supreme Court in Collins v. The State of Texas, 223 U. S., 288, 56 L. Ed., 439. 32 S. Ct., 286, and many times by the courts of this State.

However, no attack in this case is made on the constitutionality of said Act, and no Federal question is raised. and, of course, we decide no Federal question on this appeal.

Article 750, Penal Code, is: "It shall be unlawful for anyone to practice medicine in any of its branches, upon human beings, who has not registered in the district clerk's office of the county in which he resides, his authority (license) for so practicing," etc., and (art. 756, P. C.) punished as prescribed, if convicted.

The law provides for a medical board of eleven men, learned in medicine, but no school shall have a majority on the board. (R. S., art. 5733.) This article also prescribes their other requisites. Revised Statutes, article 5739 (amended in 1915), requires all applicants for license to practice medicine to successfully pass an examination before said board, and prescribes the requisites of such applicants. Revised Statutes, article 5741, enumerates the subjects of examination and requires "all examinations shall be conducted in such manner as shall be entirely fair and impartial to all individuals and every school of medicine." Penal Code, article 754, says: "Nothing in this law shall be construed as to discriminate against any particular school or system of medical practice."

Penal Code, article 755, is: "Any person shall be regarded as practicing medicine within the meaning of this Act:

"(1) Who shall publicly profess to be a physician or surgeon and shall treat, or offer to treat, any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method, or to effect cures thereof.

"(2) Or who shall treat, or offer to treat, any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method or to effect cures thereof, and charge therefor. directly or indirectly, money or other compensation."

Appellant contends, as we understand, in substance, that he is not a practitioner of medicine at all. That what he did is not embraced within the purview of said medical practice Act, nor embraced by any of the provisions thereof. That what he did was merely to practice a new science, whereby he would "remove the cause of the trouble from a person, and the vital forces of his body will assert themselves and heal him," the patient; and that, therefore, he did not have to have or record any license.

We will not quote all, nor give in full, the testimony, but will give the substance thereof as applicable herein.

R. L. Haney testified: That he kept and drove appellant's auto-

mobile for him and "hauled patients to and from his office, and sometimes I go to the house and get patients, or to the railroad station. I do this under Dr. Teem's direction. He is a chiropractic doctor. There is printed on his automobile these words: 'Dr. David B. Teem, 528 South Elm.' I have been to his office when there were patients there."

E. B. Hanna testified: That about July 1, 1915, he had a sick boy. He heard that defendant adjusted people, and this boy was in bad shape. He had other doctors examine him also. That he phoned appellant to come and see his boy. That he came after dark the first time to see him. That, when he came, he got out his table, fixed it up, put the boy on it and went to work on him. He put him on a table, rubbed his back and neck and up and down his spine. I called the doctor and paid him for adjusting the boy. He called it "adjusting." He said the human body was like machinery. He would adjust it and get it in shape, and then nature would do the rest.

R. M. Cannon testified: That he was an old man, eighty years old. That, when appellant began adjusting him, he was almost blind, but now he could see to read. That, when he first saw and had appellant to work on him, appellant told him he was constipated and was hurt in the back; that his spine had been hurt. He said I had a displacement in my body and that he could adjust that displacement, and that was all he did or was responsible for. He said he could adjust the displacement he found in my body, and nature would do the balance. The witness then described how appellant worked on him. "He just went to work on me and rubbed down my spinal column, worked on my face and eye, and I got results from it. In adjusting me, he commenced on my neck and went down my spinal column. He adjusted me from my head down, including my spine. He rubbed over my face and around my eye, sometimes both eyes. He commenced on my neck, on the muscles that lead to my eye; then over my face, principally around my neck and eye, rubbed the edge of the eye. His principal work was on the face, back and neck. In adjusting me, he used nothing except his hands. That is what I paid him for." The witness then stated that appellant worked on him many times. He manipulated with his hands. He was adjusting me for my eye. The witness further testified that appellant gave him no medicine, nothing to eat, drink, smell or feel. That, during the time appellant worked on him, he gave him different tickets for $20 each, which $20 he paid him each time, and the ticket recites that it entitled him to one adjustment for each uncanceled number in the margin of the card by the Chiropractic Adjustry, and signed his name. That he never called his work treating him.

Mrs. Ritta Barron testified: That she lived at Van Alstyne. "He first went to Van Alstyne to treat me; then I have been coming here to Sherman. When he began adjusting me, I was suffering from locked bowels. I was in a critical condition when he came. I told him my side was hurting. I don't remember that he made any examination of

my body. He found these strictures; and, when he started, of course he worked on that point. He told me he would give me an adjustment. He commenced at my neck and went down my spine. He adjusted the place that was hurting most on either side of the abdomen. He used the word 'adjust' altogether; never the word 'treat.' Dr. Teem said there was a displacement in my body that needed physical adjustment. He told me that he did not treat diseases; that he did not offer to cure or heal, but he did say to me that, when he found a displacement in my body, he adjusted it as nearly as he could"; that he regarded the body as a machine and adjusted it as a machine. He did not say that he would treat disease but that, when he adjusted the body, it would be normal. In other words, he did not deal with disease nor propose to cure, but to adjust into proper position a displacement in the body. That she paid him for the work he did upon her.

· The district clerk of Grayson County testified that appellant had no certificate or license to practice medicine recorded in Grayson County. Appellant concedes that he had no license whatever. He was shown to be a resident of Grayson County and had been for some time.

Appellant himself did not testify. He introduced three witnesses only. Neither of them in any way disputed said testimony introduced by the State.

One, R. L. Haney, testified that appellant had signs placed on the front of his residence, which was his office, between the window and door. One read: "David B. Teem, Chiropractor." The other was:

"To whom it may concern: I am not a physician, I am not a surgeon, I do not treat disease or deformity of any kind, I do not and will not offer to treat any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method. I do not offer to effect cures, I do not treat, and will not and can not treat disease or deformity or injury of any kind.

"I do propose: The person giving full co-operation that we will remove the cause of the trouble and the vital forces in his body will assert themselves and heal him, I propose to adjust, and not treat. Get your machinery fixed and nature will do the treating."

He then introduced Dr. John C. Hubbard, a resident of Oklahoma City, Oklahoma. It seems he introduced Dr. Hubbard to explain and show, in a general way, what a chiropractic did and did not do. He did not claim to know what appellant did or said as shown by the other witnesses. He testified on direct examination, then on cross-examination, then back and forth repeatedly on redirect and recross-examination. We do not propose to give his testimony in full, but different portions of it only.

Dr. Hubbard testified on direct examination: That he was a chiropractor and had been for five years. That he was a graduate of Wichita and Carver colleges, and had taken post-graduate courses. That he was a teacher in the Carver Chiropractic College of Oklahoma City. That appellant himself had attended that college two years or more and had graduated therein, said college issuing him a diploma con-

ferring upon him the degree of Doctor of Chiropractic, which carried with it the dignity, honor, and privileges of a chiropractor. This diploma was introduced, it being dated in June, 1912, and signed by the president and various professors of said college. Some colleges required a three years course; others, only two. He did not tell what said colleges taught. He said: "Adjusting, as chiropractors do, may or may not have to do with a diseased or disordered part. From the medical standpoint, a disease or disorder represents a certain condition of parts or certain conditions in organs. It does not represent displacement but the pathology. The chiropractor replaces displacements by adjusting, without necessarily having knowledge of what constitutes disease. His sole object in replacing is to replace its relationship with the component parts or segments of the body. Chiropractors do not prescribe for or undertake to cure or heal disease," then, on cross-examination, saying, they lay special stress on outside structure, which is done with the hands of the operator. "The science teaches us that the structure of the body, if it is displaced, needs replacing from a mechanical standpoint, and most of them constitute displacement in the spine. With the hands we replace or readjust displacement in the spine, bring it back to its normal condition." "Q. 'If you were to put it back in its place (speaking of a dislocated limb), you would be adjusting it, wouldn't you?' A. 'Yes, sir.'" On redirect examination, he said: "The chiropractor does not deal with disease, but merely with displacements in the physical or skeletal frame and organs of the body." On recross-examination, he said: "If a man should come to me—bring a son or daughter afflicted with mental trouble, I would not treat for that trouble. If I found the body out of order, I would properly replace the parts. This probably would and it probably would not relieve the mental trouble. I would simply do the work of replacing the structures, if necessary, so as to get the displaced parts into order. If a man comes to me suffering, I would go to work to replace the displaced parts. I would not think of the mental phase of it; that has nothing to do with our work. I would not attempt to work on a person unless I should think the work would do good. If I were called to see a person suffering with typhoid, I would examine to see; and, if adjusting be necessary, would work on the parts to correct them. With proper adjusting, the fever would probably abate." "From a professional standpoint, chiropractors know nothing about pain. They always have an object in replacing the displaced parts. Our object is to replace the parts so that the body will be in its right place. If a man should come to me suffering with pain, I would readjust the body, and it would relieve it; no doubt." "I would do what the condition represents to me. I would look for a displacement." Again, speaking of typhoid, he said: "The chiropractor would look to see what adjusting the body needed and to replace the displacement with the idea that, when the body is put in proper shape, the typhoid will disappear." "Q. 'If a person were to come to you suffering, you would not treat the fever, but look for displacements in the body, and

you would adjust the person's body as nearly as you could, with the idea if that was accurately done, the fever would disappear?' A. 'Fever always disappears when a proper adjusting is made. If we replace the displaced parts, it places the body in its normal relation.' Q. 'You would do that with the idea of a person getting well. You would put the body in a perfect shape. Then the person would get well and nature would cause it to throw off the fever?' A. 'Yes, sir.' Q. 'Pneumonia—you would adjust that in order that nature might restore the man to his former condition, would you?' A. 'If we found a case of pneumonia, we would not consider it as pneumonia. We would adjust his body as nearly as we could, with the idea that nature would correct the trouble.'" Then, on redirect examination again, he said: "As chiropractors, we have no concern about disease. We adjust displacements in people who are sick and in people who are well. That is all we attempt to do. . . . We remove the cause occasioned by displacement with the idea that the conditions caused thereby will disappear."

Appellant then introduced Mr. Bush, who testified about some of appellant's signs, unnecessary to state. The State introduced no further testimony.

We think there can be no sort of doubt but that this testimony showed, as charged in the indictment, that appellant unlawfully practiced medicine as denounced by the law, and no honest jury could have done otherwise than have found him guilty.

It may be that the colleges, from one of which appellant has a diploma, teach a new science of how to relieve "human beings" of some of the disorders or ills of this life, and effect cures thereof, but, if so, the evidence clearly demonstrates that the practice of it by appellant, whatever it be named or called, as shown in this case, without a license, and proper record of it, violated both the spirit and the letter of our law. The fact that he studiously abstained from calling his work upon patients a "treatment" of them, but instead an "adjustment of a displacement" of them, can have no possible effect to relieve him of the penalties of the law which he violated. No sort of substitution of other words for those used in the statute or refraining from using them, can change the law. The fact that, in his advertisements posted on his home and office, and to his patients, he stated specifically that he did not profess to do, nor do, the things that the statute denounces, yet, when it is unquestionably shown that he did do those very things, can not possibly have the effect to put him without the pale of the law.

His assertions in his advertisements, and to his patients, that he was not a doctor or surgeon, and that he did not treat *disease,* etc., was clearly an attempt to evade the law, and should have deceived no one. No other practitioner of any other school of medicine, whether he be called doctor, surgeon or otherwise, or whatever his method or system, treats the *disease,* etc., as contradistinguished from the patient suffering from the *disease,* etc. They each and all treat the *patient* in order to relieve him from the disease and suffering, and thereby

assist nature to heal him, as appellant is shown to have done the several persons—his patients—who testified herein. Each practitioner may have a different system or method, but the object and purpose of each is to accomplish the same result. In this case, appellant, without contradiction, is shown to have treated, or "adjusted," if he prefers to so call it, Mr. Hanna's sick boy who was in bad shape, and Mr. Cannon's sore and afflicted eye and a displacement in his spine or body, and Mrs. Barron's locked bowels, and strictures and hurting in her sides from which she was in a low, critical condition when he began treating or working on her, or "adjusting" her, whichever it may be called or termed, and charged each of them therefor and was paid by each.

We can see no possible reason, and none is shown in this record, why appellant should be exempted from procuring and registering his license to practice, when every other practitioner from every other school is required to do so. His school of medicine, or science, or practice, or adjustment, or whatever he may choose to call it, is clearly embraced by our law, as prohibiting him from practicing it on human beings for pay, without first procuring and having a license duly recorded. If he desires to practice his profession, and does so, he should first procure and record his license to do so under the law, as every other practitioner is required to do, and does; and, if he refuses to do this, then he must suffer the penalty of his own acts.

As said by the United States Supreme Court of Dr. Collins, who practiced osteopathy only, in Collins v. State of Texas, supra, so we say of Dr. Teem, "it is true he does not administer drugs. but he practices what at least purports to be the healing art. The State constitutionally may prescribe conditions to such practice considered by it to be necessary or useful to secure competency in those who follow it. . . . Whatever may be the osteopathic (chiropractic) dislike of medicines, neither the school, nor appellant, suffers a constitutional (or statutory) wrong if his place of tuition is called a medical school (or he, a medical practitioner) by the Act for the purpose of showing that it (or he) satisfies the statutory requirements." Again: "An osteopath professes (—and we think this record unquestionably also shows, that appellant, a chiropractor, does, too—) to help certain ailments by scientific manipulation affecting the nerve centers. It is intelligible, therefore, that the State should require of him a scientific training," and require him, as it does of all others who practice the healing art, or science, to procure and record a license to do so.

"No one has an inalienable right to follow the occupation of practicing medicine or treating disease for pay any more than one has the inalienable right to follow the occupation of practicing law for pay, or to practice dentistry, or any other occupation that requires and demands a certain amount of what might be termed technical knowledge of the subject which he represents he is competent to practice." (Lewis v. State, 69 Texas Crim. Rep., 593, 155 S. W. Rep., 523.)

This court has in so many cases construed our law, and uniformly

held appellants to be embraced within its provisions, under circumstances and facts, so similar to this case, we think it altogether useless to further cite or discuss them. Many of them are noted under the several articles of said Revised Statutes and Penal Code, in Vernon's annotated revisions, where they can readily be consulted.

Appellant requested quite a number of special charges. We see no necessity of taking these up separately and discussing them. Not one of them should have been given, even if appellant has preserved the point in such a way that we would be authorized to review them. Byrd v. State, 69 Texas Crim. Rep.. 35; Ryan v. State, 64 Texas Crim. Rep., 628.

He has some objections to different paragraphs of the court's charge. It is unnecessary to mention but one of these, which is his objection to the fifth subdivision, as none of the others point out any error, even if he has preserved the matter in such a way as to authorize this court to review them.

The fifth subdivision is: "If, on the other hand, you believe from the evidence that the defendant on or about the time alleged in the indictment did not practice medicine in the State of Texas in violation of the provisions of the law herein given you, you will find him not guilty and so say by your verdict."

His objection to that charge was "because it imposes upon him the burden of establishing his innocence." His bill merely quotes said subdivision, and then that he excepted to it on the ground quoted, and his bill merely states these facts. He asked no charge covering the point to which he objected.

The statute (P. C., art. 739) does not require the county judge to give any charge in misdemeanor cases. Of course, when he does, it ought to be a correct charge, but, in construing this statute, this court and the Supreme Court, when it had criminal jurisdiction, uniformly and in a great number of cases have held that the only way this court is authorized to review objections to the charge of the court of either omission or commission, is to seasonably object thereto, stating the specific objections; then preserve his bill properly to overruling such objections, if they are not met. This alone, however, is not sufficient to preserve the question for review of this court. He must go further and specially request in writing a correct charge, covering the error or omission; and, if the court refuses to give his special charge, take his bill thereto. In this case, while objecting to the charge, he did not request any correct charge on the subject; and, therefore, under the uniform decisions, this question is not presented in a way that would authorize this court to review it. Brown v. State, 73 Texas Crim. Rep., 574; Hughes v. State, 67 Texas Crim. Rep., 333, 149 S. W. Rep., 173; Golden v. State, 66 Texas Crim. Rep., 262, 146 S. W. Rep., 945; Perkins v. State, 65 Texas Crim. Rep., 311, 144 S. W. Rep., 241; Giles v. State, 66 Texas Crim. Rep., 638, 148 S. W. Rep., 317; Mealer v. State, 66 Texas Crim. Rep., 140, 145 S. W. Rep., 353. Additional

and earlier cases are cited in the opinions of each of the cases which we have just above cited.

Appellant has another bill to a part of the argument of Judge Wolfe, who represented the State in connection with the prosecuting officer. This bill on its face shows that it was in reply to appellant's argument. It being in reply and brought out and made proper by appellant's argument, that of itself would show no error. But, in addition, Judge Wolfe unquestionably had the right to make the argument and statement in this case that the bill complains of.

We have not thought it necessary to quote the said medical Act in full. We have cited the original Act, and the several sections thereof, as contained in our Revised Penal Code and Revised Civil Statutes.

No other question is raised requiring discussion.

The judgment will be affirmed.

*Affirmed.*

### ON REHEARING.

### March 22, 1916.

PRENDERGAST, PRESIDING JUDGE.—In his motion for rehearing appellant for the first time raises a question which was not even suggested nor intimated in the lower court, nor in this, until his motion for rehearing was filed.

He now contends the medical practice Act, fully cited in the original opinion as it now appears in the Revised Civil Statutes and Penal Code, was not in fact enacted at the time it purports to be, but that the Act as it first reached the Governor's hands instead was enacted and became the law, and that, therefore, he was convicted under what purported to be the law, but which in fact and reality was not the law.

In his motion he cites the House and Senate Journals of the Thirtieth Legislature at the regular session of 1907, and undertakes to show from them this state of fact: That when the bill which is designated "Senate Bill No. 26" was first introduced in the Senate, it was properly referred to a committee, reported back with the recommendation that it do pass, was then properly in its passage through the Senate amended, finally passed by that body and sent to the House. Reaching the House properly, it was referred to a committee, reported back by the House committee that it do pass, attempts made to amend it, which failed, and that the House finally passed the bill and adopted a motion to table a motion to reconsider it. That the bill then was returned to the Senate with information of the House's action. It was properly signed by the President of the Senate and Speaker of the House and so recorded in the respective Journals, as required by the Constitution, and then sent to and placed in the Governor's hands for his action. That, in a day or two, within ten days after it reached the Governor's hands, and before he ever acted thereon, or attempted to do so, the Senate and House both adopted a joint, or concurrent, resolution requesting the Governor to return the bill to the Senate for correction and amend-

ment, and that the Governor immediately complied therewith in a written communication. That bill, as thus returned, is not shown to have ever again reached the Governor's hands; nor did he direct or request its return; and he never acted thereon in any way. We have applied to the Secretary of State for that bill, if it ever reached his hands. He has furnished us the original archive of all the Acts passed by said Legislature, which we have examined, and no such Act in any way appears therein, and evidently no such Act, enrolled or otherwise, has ever in any way reached the hands of the Secretary of State, the sole legal custodian of such matters. At least, none such can be found.

The Senate then, through the proper channels, and with the proper action, again sent the bill to the House. The House rescinded its action in passing the bill to a third reading and final passage, and the bill was thereupon entered on the calendar on its second reading as it came from its committee. When the Speaker afterwards, and in regular order, properly laid the bill before the House for its second reading and final passage, the point was made that the House had no power to recall the bill from the Governor, and that it had become a law under article 4, section 14, of our Constitution, and Wolfe v. McCaull, 76 Virginia, 876, cited as authority to such effect. The point was ruled against by the Speaker, and thereupon the bill was corrected and amended and passed; then returned properly to the Senate. The Senate concurred in the House amendments, and so informed the House. The bill, as then corrected and amended, was properly enrolled and signed by the President of the Senate and the Speaker of the House in their respective open sessions and due record made thereof in their respective Journals. The bill as thus passed was also copied in full in the Senate Journal. This bill, as thus corrected and amended and passed, enrolled and signed, was sent to the Governor and duly approved by him as such within the time required by the Constitution, and by him delivered to the Secretary of State, where it thus fully appears as an archive of his office, and he had it duly printed and promulgated as the Act of the Legislature. The printed law in the Acts of the Thirtieth Legislature is an exact copy of said archive in the Secretary of State's office, except, of course, the printed Act omits the signatures of the President of the Senate, Speaker of the House, the Governor and the Secretary of State noting when it was delivered to and filed by him, as is always done in printing the Acts of the Legislature.

Before passing from the said Journals, we will state some of the amendments which were attempted to be passed to said bill in both the Senate and House on its original passage in each.

In the Senate: Section 13 was attempted to be amended by adding these words: "Provided, the provisions of this Act shall not apply to any magnetic healer who has been practicing his or her profession fifteen years in this State prior to the taking effect of this Act." Section 10 was attempted to be amended after the words "publicly represent themselves as such," by adding this: "Nor to certified members

of regularly organized churches, who include in the exercise of their religious faith healing the sick by purely spiritual means without the use of drugs or any material methods; provided, such persons shall not practice midwifery, visit patients suffering with contagious diseases, or undertake the treatment of injuries requiring the services of a surgeon without the co-operation of a surgeon."

· In the House: Section 10 was attempted to be amended by adding this: "Nor to any person who practices the art of healing without the use of medicines and does not practice surgery." And again, by adding to section 10, this: "Provided, that the provisions of this Act do not apply to persons treating disease who do not prescribe or give drugs .or medicine, and who have been legally practicing continuously within the State of Texas for a period of five years prior to the passage of this Act."

All these attempted amendments, in both the. Senate and House, were defeated, and both bodies refused to amend the bill by adding any of them thereto.

Section 13 of the Act as contained in the bill when originally introduced was as follows: "Any person shall be regarded as practicing medicine within the meaning of this Act who shall publicly profess to be a physician or surgeon; or shall treat, or offer to treat. any disease, deformity or injury, by any system or method, and charge therefor, directly or indirectly, money or other compensation."

Before its passage when first before the Senate, section 13, by proper amendment duly adopted, was changed after the semicolon, beginning with the word "or," so as to read as follows: "or shall treat or offer to treat any disease or disorder, mental or physical, deformity or injury, by any system or method, or to effect cures thereof and charge therefor, directly or indirectly, money or other compensation."

This section 13 as finally passed and became the law in 1907 was copied in the original opinion.

Recurring now to appellant's attack on the validity of said law, we will further state that none of the proceedings of either house or the said action of the Governor was offered in evidence in any way in the lower court on the trial. Nothing whatever about them appears in the record as it came from the lower court, and nothing now except in appellant's motion for rehearing, signed simply by his attorneys.

In the case of Ex parte Tipton, 28 Texas Crim. App., 443, this court said: "How far will the courts of this State go in inquiring into the Acts of the legislative department of the government? When a bill has been authenticated by the signatures of the President of the Senate, and the Speaker of the House of Representatives, and the Governor of the State, and has been deposited in the office of the Secretary of State, and published as a law of the State, will the courts of this State, from the journals of the Legislature or other evidence, determine that the statute is not a valid law because not enacted in accordance with the formalities required by the Constitution, or because the statute so authenticated is not the one enacted by the Legislature?"

And then answered this query as follows: "In Usener v. State, 8 Texas Crim. App., 177, this court quotes approvingly from State v. Swift, 10 Nevada, 176, as follows: 'Where an Act has been passed by the Legislature, signed by the proper officers of each house, approved by the Governor, and filed in the office of the Secretary of State, it constitutes a record which is conclusive evidence of the passage of the Act as enrolled. Neither the journals kept by the Legislature, nor the bill as originally introduced, nor the amendments attached to it, nor parol evidence, can be received in order to show that an Act of the Legislature, properly enrolled, authenticated, and deposited with the Secretary of State, did not become a law. This court, for the purpose of informing itself of the existence or terms of a law, can not look beyond the enrolled Act, certified to by those officers who are charged by the Constitution with the duty of certifying and with the duty of deciding what laws have been enacted.'"

In the Usener case, this court further said that in said case of State v. Swift, all the authorities, pro and con, were collated and most carefully elaborated and reviewed, and the result arrived at as quoted just above. This doctrine is held both by this court and our Supreme Court and Courts of Civil Appeals. Williams v. Taylor, 83 Texas, 667, 19 S. W. Rep., 156; Blessing v. City of Galveston, 42 Texas, 641; Usener v. State, supra; Ex parte Tipton, supra, 13 S. W. Rep., 610; McLane v. Paschal, 8 Texas Civ. App., 398, 28 S. W. Rep., 713; Baldwin v. State, 21 Texas Crim. App., 593, 3 S. W. Rep., 110; Day Land, etc., Co. v. State, 68 Texas, 526, 4 S. W. Rep., 865; Ry. v. Foth, 45 Texas Civ. App., 275, 100 S. W. Rep., 176; Doherty v. City of Galveston, 19 Texas Civ. App., 708, 48 S. W. Rep., 804; Presidio County v. Bank, 20 Texas Civ. App., 511, 44 S. W. Rep., 1069; State v. Larkin, 41 Texas Civ. App., 253, 90 S. W. Rep., 917; Parshall v. State, 62 Texas Crim. Rep., 177, 138 S. W. Rep., 759. It is also so held by the United States Supreme Court. (Field v. Clark, 143 U. S., 649; Lyons v. Woods, 153 U. S., 649.) And the courts of the following States also so hold: California, Indiana, Kentucky, Mississippi, Montana, Nevada, New Jersey, New York, North Carolina, North Dakota, Pennsylvania, Utah and Washington. (36 Cyc., 972, and note 7.) So that while we have examined the journals of both houses and recited what they show, we can not look to nor consider them so as to defeat the said Act or hold it invalid, even if by doing so such would be their effect.

But suppose we could look to the journals for any such purpose; then, instead of their showing that said Act was invalid because of the method by which both houses secured the return of the bill from the Governor as first passed and then corrected and amended and passed it and in its corrected and amended condition placed it in the Governor's hands, who then approved and filed it with the Secretary of State, the very reverse of this is true. There is no provision of our Constitution which directly prohibits either or both houses of the Legislature with the Governor's consent to procure the return from him of a bill that had been passed and placed in his hands, before he had

in any way acted thereon. Nor is there any provision in our Constitution prohibiting this by implication even. As a basis for appellant's contention, he cites only section 37, article 3, and section 14, article 4, of our Constitution, and said case of Wolfe v. McCaull, supra, and Pickle v. McCall, 86 Texas, 212. Said article 3, section 37, simply requires that no bill shall be considered by the Legislature unless it has been first referred to a committee and reported thereon; and shall not be passed unless it has been presented and referred to and reported from a committee at least three days before the final adjournment. The journals of both houses with absolute certainty show that this constitutional provision was literally complied with by both houses. Said section 14, article 4, directs and regulates when and how the Governor can approve or veto any such bill or do neither when it reaches him. It is quite lengthy and unnecessary to recite. There is nothing in it which either directly or indirectly prohibits him, before he acts on it, from returning it to either house at their request. In this instance, the journals, as we have stated, clearly and without any doubt, show that both houses requested the Governor to return the original bill as first passed, to the Senate for correction and amendment, before he had in any way acted thereon, and before the time given him by the Constitution to act thereon had expired and that he promptly complied with their request, and that thereupon after that bill was returned the Senate properly sent it to the House, which then rescinded all of its previous actions in passing the bill, and then in regular order amended and properly passed the bill as amended, afterwards returning it to the Senate, which accepted the amendments of the House, and then passed and properly enrolled the bill as thus corrected and amended. That that bill was then properly enrolled, signed by the President of the Senate and the Speaker of the House in open session, and the proper entries showing it was thus signed made in the journals of the respective houses, and then as corrected and amended and finally passed delivered to the Governor, who approved it officially and delivered it to the Secretary of State to be published as the law, and it was so published.

Our Constitution, section 11, article 3, expressly gives each house the right, power and authority to determine the rules of its own proceedings. In searching through the journals for these rules, we find that neither house had any rule which either directly or indirectly prevented them, or either of them, from recalling from the Governor a bill which they had passed and placed in his hands, for his action for correction and amendment before he had acted thereon. On the contrary, we find that each house had adopted, and there was in force, before this bill was even introduced, and continuously thereafter, a rule which provided that where their rules were silent or inexplicit on any question of order or parliamentary practice, Jefferson's Manual and the Digest of the Rules of Practice of the United States House of Representatives shall be considered as authority. Upon an examination of said Jefferson's Manual and Digest for 1906-7, page 479, we find sev-

eral instances given wherein in the second session of the Fifty-sixth Congress the Congress repeatedly recalled properly enrolled bills which were in the hands of the President at the time, he complying with their request, and such bills were thereafter amended, corrected and passed, enrolled, and then returned to the President for his action, and he then acted thereon. In each instance the President complied with the request, as did the Governor in this instance. We also find in 4 Hines' Precedents, sections 3505 to 3518, numerous instances where this action was had by Congress from the very first and all along. In some instances, the President had actually affixed his signature to the bills approving them, but when Congress requested their return, he erased his signature and complied with their request, returned the bill, and then it was amended, corrected and returned to him for his action, and he then acted thereon. In no instance do we find that the President ever denied such request, and we can find no decision wherein it was ever held, that such action on a bill by the President and Congress was illegal, irregular or improper.

Our Supreme Court, in Fulmore v. Lane, 104 Texas, 509, said: "The veto power when exercised is a legislative and not an executive function. Pickle v. McCall, 86 Texas, 212; Cooley on Const. Lim., 185; People v. Bowen, 21 N. Y., 517." Gottstein v. Lister, 153 Pac. Rep., 601, and authorities there cited. This being so, the Governor in connection with both houses of the Legislature when the houses request the return from him of a bill, and he does so before acting thereon, then they all,—both houses and the Governor, are acting in a legislative, and neither house nor the Governor, is acting in an executive function. So that, under their very rules, both houses at the time were acting in obedience to and in strict compliance with the rules and authority, and in no way can their action be considered as ultra vires or in any way affecting the validity of a bill otherwise properly passed, authenticated and published as the law.

We think the case of Wolfe v. McCaull, supra, is not in point and can not be held to be so. In that case, both houses of the Legislature had finally passed and enrolled a bill, and had delivered it to the Governor for his action. The Senate requested the Governor to return it, which he did temporarily only as a courtesy to the Senate. The opinion of the court specifically says: "The return of the bill with the brief communication from the Governor, was not such a return of the bill as is contemplated by the Constitution. The very language of that communication negatives the idea that he disapproved the bill. It states no ground of objections, but returns it in response to a joint resolution of the general assembly requesting a return of the bill. *The truth is, the bill was never beyond the executive control, as shown by the fact that the Governor; on the very day of its return to the Senate, sent for the bill, and it was returned to him by the clerk of the Senate and kept by him until it was placed in the hands of the keeper of the rolls, together with other bills.* The mere delivery by the Governor of this bill to the Senate, at the request of the general assembly, was of

no effect, but was merely an act of courtesy which was of no legal effect, *and in contemplation of law the bill never left the Governor's hands until it was placed in the hands of the keeper of the rolls.*" (Italics ours.) The keeper of the rolls in Virginia, it seems, corresponds exactly with our Secretary of State as the custodian of enrolled bills which have been acted upon by the Governor. In the opinion in that case, it was conclusively shown that the Legislature never in any way acted upon the bill after the Governor returned it to the Senate as a courtesy, but that promptly upon his request, without any action whatever by the Legislature, or either house, on the bill, it was promptly returned to the Governor, approved by him and placed with the keeper of rolls, and unquestionably as decided in that case thereby became a valid law. No such state of facts exist in this case, but the very reverse of what occurred in that case are the facts. It is true, the Virginia court in that case went on to decide that the Legislature had no power to request, nor the Governor to comply with the request, to return the bill to the Legislature for its further or future action, but the decision of that point was clearly *obiter dicta.* Our Supreme Court, in Pickle v. McCall, supra, recited in effect that the Virginia court had so held, but our Supreme Court not even by implication approved that decision; on the contrary, what it did say indicates that such would not be the law in this State, stating: "Whether facts might exist that would make such a recall, before the Executive had acted upon the bill, lawful, need not now be considered, for such a course would not involve a violation of the rule that both at the same time (the Legislature and the Executive) can not have power over a bill." So that neither the Virginia case nor the case of Pickle v. McCall are in point as sustaining appellant's contention.

Many instances could be mentioned wherein it would be proper, the Governor and the houses of the Legislature acting in concert, at the request of both houses, for the Governor to return such a bill for correction, and even for amendment, after it had been placed in his hands, and before he acted upon it, or the time expired in which he was required to act upon it. It is unnecessary to mention these instances. They will readily occur to anyone. Of course, if the Governor should decline to return the bill but keep it and act upon it, and especially approve and file it with the Secretary of State, as was done in the Virginia case, an altogether different question would arise, but no such state of fact existed in this instance. The very reverse state of facts did exist. So that, if we could look to the journals at all in this instance, they would show that the action of both houses and the Governor was in accordance with the legislative rules pertaining to such matters, and the action of the Governor and both houses were legitimate and proper, and in no way would they invalidate the bill which was passed, signed, approved and published as a law.

Further, even if it could be considered that we are in error in either or both of the propositions above, then the fact that the Thirty-second Legislature, at its regular session in 1911, duly enacted and passed

both the Revised Civil Statutes and Penal Code, and that said law was fully re-enacted therein, thereby made the said law as contained in these revisions perfectly legal and in every way valid. We recited in the original opinion both the Revised Civil Statutes and the Revised Penal Code, wherein the said Act was contained. So that in any and all events, the said law under which appellant was convicted was in every way valid and legal.

Again, even if appellant's contention to the effect that said Act as published was not legally passed but that the first Act that was delivered to the Governor became the law, it would be of no avail to him, for so far as the offense charged and proven against him is concerned, it is as fully covered by the provisions of said first Act as it is by the last, as will readily be seen by comparison of the two sections 13. In no event could appellant have legally escaped conviction.

The motion for rehearing is, therefore, overruled.

*Overruled.*

DAVIDSON, JUDGE, absent.