In the Matter of the CITY OF LONG BEACH, Appellant, against PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent.

LONG BEACH BUS COMPANY, Respondent.

(Submitted November 19, 1928; decided December 31, 1928.)

*Maurice Rubinger* and *Walter Underhill* for appellant. The attempted granting of the franchise by the City Council violated the provisions of the charter of the city of Long Beach and was void. (L. 1922, ch. 635, §§ 71, 76; *Quinby* v. *Public Service Comm.*, 223 N. Y. 244; *City of Rochester* v. *Bloss*, 185 N. Y. 42; *Matter of Pennie*, 108 N. Y. 364; *Gleason* v. *Peerless Mfg. Co.*, 1 App. Div. 257; 163 N. Y. 574.)

*Harry Myron Chamberlain* and *Charles G. Blakeslee* for Public Service Commission, respondent. The resolution of December 17, 1925, granting the city's consent did not have to be signed by the mayor. The attempted veto by the mayor was and is a nullity. (L. 1922, ch. 635, § 71; *Hoey* v. *Dalton*, 126 Misc. Rep. 194. The new City Council of the city of Long Beach had no power to revoke the consent granted by the previous City Council to the assignor of Long Beach Bus Company, Inc., and its action in attempting to revoke such consent was and is a nullity. (*Coney Island, etc., R. R. Co.* v. *Kennedy*, 15 App. Div. 588; *Suburban Rapid Transit Co.* v. *Mayer*, 128 N. Y. 510; *New York* v. *Second Avenue R. R. Co.*, 32 N. Y. 261; *City of Buffalo* v. *Chadeayne*,

134 N. Y. 163; *People ex rel. City of Olean* v. *Western N. Y. & Penn. Traction Co.*, 214 N. Y. 526; *People* v. *O'Brien*, 111 N. Y. 1; *Lord* v. *Equitable Life Assurance Soc.*, 194 N. Y. 212; *People ex rel. Woodhaven Gas Light Co.* v. *Beehan*, 153 N. Y. 528; *Huntington Traction Co., Inc.*, v. *Walker*, 209 App. Div. 904; *People ex rel. City of New York* v. *New York Railways Co.*, 217 N. Y. 310.)

*John J. Curtin* and *Irving G. Warshaw* for Long Beach Bus Company, respondent. The attempted veto by the mayor and the action of the new City Council on January 2, 1926, attempting to rescind and repeal the resolution granting the franchise on December 17, 1925, was and is a nullity. (*Bohl* v. *City of Schenectady*, 220 N. Y. Supp. 349.)

KELLOGG, J. The Public Service Commission, on the third day of March, 1926, after hearing the proofs and arguments of the parties, issued its certificate to the Long Beach Bus Company, Inc., the intervenor, whereby it certified that public convenience and necessity required the operation, by that corporation, of a motor bus line along certain streets in the city of Long Beach, the petitioner. The petitioner seeks to review the action of the Public Service Commission in granting this certificate and asks for a reversal of the decision on the ground, among others, that its consent to the operation upon its streets of the vehicles of the Long Beach Bus Company, Inc., had not been legally given prior to the issuance of the certificate.

The Transportation Corporations Law (Cons. Laws, ch. 63) now contains section 25, a section added to the law by chapter 495 of the Laws of 1913, and thereafter amended by chapter 667 of the Laws of 1915. The section provides that any person or corporation operating a bus line along any street of a city " shall be deemed to be included within the meaning of the term ' common carrier ' as used in

the public service commissions law and shall be required to obtain a certificate of convenience and necessity for the operation of the route or vehicles proposed to be operated, and shall be subject to all the provisions of the said law applicable to common carriers." The Public Service Commissions Law (Cons. Laws, ch. 48) as re-enacted in the year 1910 (Laws of 1910, ch. 480), provides in section 53 that " no railroad corporation * * * shall begin the construction of a railroad " nor shall any " common carrier exercise any franchise or right under any provision of the Railroad Law, or of any other law, not heretofore lawfully exercised, without first having obtained the permission and approval of the proper commission." Under the Railroad Law (Laws of 1892, ch. 676, amd. L. 1895, ch. 575, § 1), also re-enacted in the year 1910 (Laws of 1910, ch. 481), no railroad corporation may begin the construction of its railway until the Public Service Commission has made its certificate, certifying that " public convenience and necessity require the construction of said railroad." Although the Railroad Law is not expressly referred to in section 25 of the Transportation Corporations Law, it is the undoubted meaning of the section that every person proposing to operate a bus line must first obtain a certificate from the Public Service Commission, similar to the certificate required by the Railroad Law, certifying that " public convenience and necessity require " the operation of the proposed route. (*N. Y., O. & W. Ry. Co.* v. *Griffin*, 235 N. Y. 174.)

In the year 1915 section 26 was added to the Transportation Corporations Law. (Laws of 1915, ch. 667.) The section, as originally enacted, provided that " No bus line * * * shall be operated wholly or partly upon or along any street * * * in any city, nor receive a certificate of public convenience and necessity until the owner or owners thereof shall have procured, after public notice and a hearing, the consent of the local authorities of said city, as defined by the Railroad Law,

to such operation * * *." The intervenor places great reliance upon the word "received," employed in this section. It reasons that the Commission is not directed by the section to refuse its certificate until local consent is granted, but the applicant for the certificate is merely forbidden to "receive" it, that is to say, it is inhibited from exercising a privilege thereby intended to be conferred. The argument, while ingenious, is not tenable. The section provides that, without the procurement of local consent (1) no bus line shall be operated upon the local streets and (2) no applicant therefor shall receive a certificate of public convenience and necessity. The proposed interpretation of the phrase "receive a certificate," to have the meaning "receive the benefits of a certificate," renders the second prohibition wholly meaningless, since the first prohibition would be sufficient to cover the entire field.

In the year 1919 there was added to section 26 of the Transportation Corporations Law a new clause. (Laws of 1919, ch. 307.) This clause provided that the town board of any town or the board of trustees of any village might adopt a resolution providing that the section should apply to such town or village. It further provided that after the adoption of such a resolution "no bus line * * * shall be operated * * * in such town or village, nor receive a certificate of public convenience and necessity until the owner or owners thereof shall have procured the consent of the local authorities of such town or village * * *." In *New York, Ontario & Western Railway Company* v. *Griffin* (*supra*) this court had before it the case of a bus corporation which had obtained from the Public Service Commission a certificate of convenience and necessity for the operation of its vehicles in the village of Liberty, a village which had by resolution adopted the provisions of section 26. In an opinion by CRANE, J., the court said: "Before the public service commission granted its cer-

tificate of public convenience and necessity the village of Liberty by resolution of its trustees had come within these provisions of section 26 and it was necessary for the defendant owner to procure the consent of the village trustees before the certificate of public convenience and necessity could be issued permitting the operation of buses on the streets of the village."

In 1926 the Legislature revised and re-enacted the Transportation Corporations Law. (Laws of 1926, ch. 762.) Section 66 of the re-enacted law is substantially the same as former section 26. However, it provides, not that a bus operator is forbidden to " receive a certificate of public convenience and necessity " until local consent has been procured, but that no such certificate shall " be issued " until the consent has been obtained. It is true that this rewording of the provision was made after the certificate now in question had been issued. It is significant, however, that the Legislature saw fit so to reword the statutory provisions that the meaning ascribed by Judge CRANE to the provisions of section 26 was given precise expression in the enactment of section 66. We think it entirely clear that unless the local authorities of the city of Long Beach had legally consented to the operation upon its streets of the intervenor's buses, the Public Service Commission was without jurisdiction to issue the certificate in question.

Whether the city of Long Beach ever gave its consent to the operation of the intervenor's buses upon its streets depends upon legal principles which are to be applied to an admitted state of facts. The facts are, briefly, these: On December 11, 1925, Elliott B. Seagraves filed with the city council of the city of Long Beach an application for the consent of the city to the operation of a bus line upon certain streets of the city. On December 17, 1925, a special meeting of the council was held, at which all the members of the council, including the mayor, in number, five, were present. A resolution or ordinance, whereby

the consent of the common council to the operation of the proposed bus route was apparently given was adopted by a vote of four to one, the mayor voting " no " and the others voting " aye." The mayor thereupon said: " I hereby take this resolution under consideration for veto and would ask the city clerk to submit the papers to me tomorrow so that I may act within a reasonable time." On December 18, 1925, Seagraves assigned the consent, apparently thus obtained, to the Long Beach Bus Company, Inc., the intervenor. On December 21, 1925, the Long Beach Bus Company, Inc., filed with the Public Service Commission its petition for a certificate of convenience and necessity. On January 2, 1926, the city council again met. Four of the councilmen, having failed of election in the preceding month of November, had gone out of office and four other men had been elected to take their places. The mayor of the city, who had been continued in office, announced his veto of the resolution previously adopted on December 17, 1925, whereby consent had apparently been granted to Elliott B. Seagraves. His written veto of the prior resolution was filed with the common council. Thereupon the common council adopted a resolution unanimously rescinding the apparent consent theretofore given to Seagraves. It was after this meeting, in March, 1926, that the certificate of public convenience and necessity now in question was granted by the Public Service Commission.

The charter of the city of Long Beach (Laws of 1922, ch. 635), in section 70 thereof, provides, in part, as follows: " All the legislative powers of the city, howsoever conferred upon or possessed by it, are hereby vested in the council of the city of Long Beach, save as may be hereafter specially excepted. Such council shall be composed of the mayor, three councilmen and the supervisor, each of whom shall have a right to vote on all questions coming before the council." In section 71 the charter

provides, in part, as follows: " Meetings of the council shall be public. Stated meetings thereof shall be held at such times as the council shall prescribe by ordinance. * * * The mayor shall preside at all meetings. He shall have power to veto any motion, resolution or ordinance. Any such motion vetoed by the mayor may be passed by the council by a four-fifths vote over his veto, and the same shall be carried and enacted as though it received the mayor's affirmative vote and signature. Every resolution or ordinance passed by the council must be signed by the mayor, or by three councilmen and must be properly recorded before the same shall be in force."

It will be noted that the provision in relation to the mayor's right of veto is simply this: " He shall have power to veto any motion, resolution or ordinance." The method of exercising the veto, whether by voice or by writing; the time within which a veto must be exercised; the result which follows if the mayor neglects to pronounce or file a veto; whether, in case of such neglect, the resolution becomes effective or utterly fails; these are matters concerning which the charter is wholly silent. The respondent and the intervenor argue that the mayor must exercise his veto forthwith; the petitioner that he must exercise it within a reasonable time. Evidently, between the two extremes, of a time which is immediate and a time which is reasonable, there is no satisfactory intermediate point which may be selected to determine the timeliness of a veto. The one or the other must be chosen. Which it shall be must be determined by a reference to those attributes with which the veto power is generally conceived to be invested.

The opinion is commonly entertained that the veto power is not executive in its nature, but essentially legislative. (Mason, The Veto Power, sec. 100; Black on Constitutional Law, sec. 67; Hare's American Constitutional Law, vol. 1, p. 212; Cooley, General Principles of Constitutional Law, p. 51 [third ed. 1898]; *Commonwealth*

v. *Barnett*, 199 Penn. St. 161 at p. 170.) In respect to the exercise of a veto power the chief executive of the Nation or of a State is in effect a third branch of the Legislature. (Black, sec. 67; Cooley, p. 51; Hare, p. 212.) In our case, the mayor served in a double capacity. He was a voting member of the legislative body, the common council; he was the chief executive of the city, having the legislative power of veto exercisable by himself alone. " The power of the mayor to approve or disapprove an ordinance is entirely separate and distinct from the functions with which he may be vested as presiding officer of the common council." (Dillon, Municipal Corporations, sec. 578.) The fact that the mayor, as a member of the council, hears an ordinance read, puts a motion for its adoption, declares it adopted and signs and approves the journal in which it is entered, " is not a compliance with a statutory requirement that the ordinance be approved by him, or passed by a specified majority over his veto, and does not dispense with his approval in the manner prescribed by the charter." (Id.) In *Cassidy* v. *City of Brooklyn* (60 Barbour, 105; affd. in 47 N. Y. 659, and subsequently cited with approval in *People ex rel. Ennis* v. *Schroeder*, 76 N. Y. 160) it was held that a mayor who sat as a voting member of a common council might subsequently veto a resolution passed at a meeting participated in by him. Clearly, the presence of a mayor, with a councilman's power, is not the presence of a mayor with the legislative power of an executive; nor does it follow that, because the council is in session, the mayor, as a legislating executive, is likewise in session. Although the councilmen and the mayor may be physically present at the same place and time, the council as a body, and the mayor as an official, are distinct and independent governmental authorities and the functioning of the one in nowise furnishes a criterion of timeliness for the functioning of the other. Carried to its logical conclusion, the argument for immediate veto

would deny to the mayor all vetoing power unless he was physically in attendance during the meeting of the council or at the conclusion of the meeting. Carried one step further, the mayor would exercise his power of veto or approval when he voted as a councilman against or in favor of a resolution. The adoption of that conclusion would destroy the case of the respondent and the intervenor, since in this instance the mayor voted against the resolution granting consent and the resolution was not repassed over his veto. We think there is no force in the contention that the mayor must have exercised his power of veto either during the meeting of the common council or immediately upon its adjournment.

The purpose of the veto power "is to increase the chances in favour of the community against the passing of bad laws, through haste, inadvertence, or design" (The Federalist, 1866, p. 548); the veto power is "a guard against hasty and inconsiderate action" (Webster's Works, vol. 1, p. 267); "The power is important as an additional security against the enactment of rash, immature, and improper laws" (Story on the Constitution, vol. 1, p. 625.) Clearly, the evil of hasty legislation would find no cure in an equally hasty veto or approval. In order, then, that a mayor's power of approval or disapproval of a legislative act may be made to serve the very purpose of its bestowal, ample opportunity for deliberation should be afforded. We hold that the mayor of the city of Long Beach was entitled, within a reasonable time, to veto or approve the Seagraves resolution.

The period for a positive exercise of a veto by an executive is fixed at ten days by the Federal Constitution, the State Constitution, the Second Class Cities Law, the New York city charter, and various other city charters which have been granted by the State Legislature. Under the two Constitutions the period during which the executive may by action or inaction render an enactment nugatory, varies in length accordingly as Congress or the

Legislature may be in session. If in session, the bill presented becomes a law, unless the executive acts in a positive manner, within ten days, by returning the bill with his veto. On the other hand, if the legislative body is not in session, and the executive fails to act within thirty days, the bill does not become a law. (U. S. Const. art. 1, sec. 7; State Const. art. IV, sec. 9.) The controlling factor is the presence of the legislative body in regular session, or the absence of such a body. Self-evidently, the ten-day provision obtains, when the Legislature is present, in order that, upon the prompt return of a veto, that body may exercise its prerogative of repassing the bill over the veto by a sufficient vote, so that it may become a law. We think that the limits of a reasonable period, for the exercise of the veto power by the mayor of Long Beach, should be determined by these analogies and the reasons which have given them vogue. He should have a minimum period of ten days, or if the common council is not in regular session during that period, then until the next regular meeting of the common council. This is substantially the provision of the New York city charter. (Greater New York charter, sec. 40.) We fix upon the next "regular" meeting rather than a special meeting for the reason that the power to shorten the veto period by calling a special meeting should not be accorded to members of the common council. Stated meetings of the common council of the city of Long Beach must be held at such times as the council shall prescribe by ordinance. (Laws of 1922, ch. 635, sec. 71.) There is proof in the case that monthly meetings have been prescribed by ordinance. The date when such meetings are required to be held has not been given. However, it appears from the proof that all the meetings held between December 17, 1925, when the Seagraves resolution was passed, and January 2, 1926, when the mayor filed his veto, were special, not regular, meetings. Therefore, we hold that the period for the

exercise of the veto power had not been exhausted and that the veto filed on January 2, 1926, was effective to nullify the resolution of consent.

The charter of the city of Long Beach (Laws of 1922, ch. 635) in section 85 thereof provides in part as follows: " In legislative sessions the council shall act by ordinance, resolution or motion　*　*　*.　No ordinance shall be passed finally on the date it is introduced, except in cases of special emergency.　*　*　*　No ordinance making grant of any franchise or special privilege shall ever be passed as an emergency measure."　Section 76 provides that " Every ordinance or resolution　*　*　*　authorizing any franchise or right to occupy or use the streets, *　*　*　shall be complete in the form in which it is finally passed " and that " every proposed ordinance shall be published once in full in a newspaper published in the city of Long Beach　*　*　*　at least ten days before such ordinance is finally passed."　The consent of local authorities to the operation of buses upon its streets, when coupled with a certificate of convenience and necessity issued by the Public Service Commission, constitutes a grant of a special franchise.　(*City of New York* v. *Bryan*, 196 N. Y. 158.)　We take it to be the clear meaning of the charter provisions quoted that in the city of Long Beach the required consents may be granted only through the medium of an ordinance.　Such an ordinance must be published in a newspaper at least ten days before it is finally passed.　There was no such publication of the Seagraves resolution.　Therefore, the resolution did not constitute an ordinance; it had not been legally adopted as such; it was ineffective to constitute a consent by the city to the operation of the intervenor's buses upon the city streets.

For these reasons we think that the Public Service Commission was without jurisdiction to issue a certificate of convenience and necessity to the intervenor.

The order of the Appellate Division should be reversed

and the determination of the Public Service Commission annulled, with costs in all courts.

ANDREWS, J. (dissenting). The power of the Public Service Commission to grant a certain certificate of convenience and necessity is here challenged. Under section 20 of the Transportation Corporations Law a corporation was organized to operate omnibuses upon public streets in the city of Long Beach. It is, therefore, a " common carrier " within the meaning of the Public Service Commissions Law and it must obtain the consent of the city, given by the common council " acting subject to the power now possessed by the mayor to veto ordinances." It must also obtain the certificate mentioned, but this may not be received until " after public notice and a hearing, the consent of the local authorities " of Long Beach has been procured. Only then may its line be operated. (Transportation Corp. Law, secs. 25, 26; Railroad Law, sec. 171.)

It is claimed that this local consent is a prerequisite to any action on the part of the Commission. Should it appear, therefore, that it has not in fact been given because a favorable ordinance or resolution has been vetoed by the mayor; because there has been no public notice or hearing; because some provision of a city charter as to the method of adopting ordinances has been neglected; because for any reason the consent is invalid; then the Commission has no jurisdiction. It is required to determine for itself, as a preliminary matter, questions of law and fact, often, as here, numerous; often doubtful.

Such was not the intent of the Legislature. There was no design to turn the attention of the Commission from its appropriate and exacting duties. In one section a corporation is required to obtain a certificate. In the next it is forbidden to operate until it has procured local consent, nor receive the certificate until it has done so. Here is no hint of a limitation of the jurisdiction of the

Commission. Had such been designed it naturally would have been placed in section 25 or in some part of the Commissions Law. At least it would have been plainly expressed in this paragraph, not left to inference from a casual statement. The injunction that the consent shall not be received by the petitioner until the consent is procured may not be so extended. The word " receive " may have been inapt. Yet one meaning is " to be affected by the thing transmitted." Here two distinct prerequisites to the operation of omnibuses over city streets are specified, the certificate and the consent. The corporation may not take delivery of the former, it may not accept it when offered in the sense of treating it as alone adequate for its purposes. The whole purpose of section 26 is to indicate that local consent is necessary and that it may be given subject to terms, not to fix the time when it shall be obtained. It is also to prohibit beyond question all operation until compliance with every condition imposed by statute.

In the record is a concession that public convenience and necessity would be promoted by the grant of this certificate. I think that to be the sole question with which the Commission deals. Its action was, therefore, right. If in truth the corporation has never obtained the consent of the local authorities, then until it does so it may not operate in the public streets of the city. Such a dispute is to be settled elsewhere.

The judgment of the Appellate Division should be affirmed, with costs.

CARDOZO, Ch. J., POUND, CRANE and O'BRIEN, JJ., concur with KELLOGG, J.; ANDREWS, J., dissents in opinion, in which LEHMAN, J., concurs.

Ordered accordingly.