576 A.2d 766

**Marvin MANDEL**

v.

**James F. O'HARA, III et al.**

**No. 33, Sept. Term, 1990.**

Court of Appeals of Maryland.

July 27, 1990.

104

Marvin Mandel, Annapolis, and H. Thomas Howell (Semmes, Bowen & Semmes, Baltimore, on brief), for petitioner.

Roy L. Mason (Angus R. Everton, Gary R. Jones, Montedonico & Mason, Chartered, Baltimore, on brief), for respondents.

Argued Before COLE, RODOWSKY, JOHN J. GARRITY, Judge of Court of Special Appeals (Specially Assigned), THEODORE G. BLOOM, Judge of the Court of Special Appeals, Specially Assigned, DALE R. CATHELL, Judge of the Court of Special Appeals, Specially Assigned, MARVIN H. SMITH, Judge of the Court of Appeals (Retired), Specially Assigned, and JAMES S. GETTY, Judge of the Court of Special Appeals (Retired), Specially Assigned.

RODOWSKY, Judge.

This case involves public official immunity from liability for common law, nonconstitutional torts. At issue is the extent of the immunity of Governors of Maryland when an alleged tort is based upon their vetoing or approving legisla-

tion. For the reasons set forth below we hold, as a matter of Maryland common law, that the immunity applicable to the gubernatorial veto/approval function is, civilly, as complete an immunity as that which protects members of the General Assembly when voting for or against legislative bills. Under that type of immunity damages in tort may not be awarded against either a Governor or a member of the legislature based upon what a court or jury believes were the motives underlying the public official's exercise of these functions.

Appellees, James F. O'Hara, III and Michael P. O'Hara (the O'Haras), are the remaining plaintiffs in this suit which was instituted in 1978. They were stockholders in the corporation which owned the Marlboro racetrack. Their complaint now consists of one count alleging that common law deceit was practiced upon them in the December 31, 1971, sale of their Marlboro stock. In a previous appeal in this case, we reversed a summary judgment in favor of the defendants based on limitations. *O'Hara v. Kovens*, 305 Md. 280, 503 A.2d 1313 (1986).[1]

Defendants in this action (collectively, the Kovens Group) include former Governor Marvin Mandel, the instant appellant.

Certain undisputed background facts are set forth in *O'Hara*.

"Prior to, or during, the 1971 session of the Maryland General Assembly, Marlboro and an entity (Hagerstown) which also conducted horse racing with parimutuel betting had agreed that Hagerstown would sell to Marlboro eighteen racing days theretofore utilized for the Hagerstown meeting. Those eighteen days, together with eighteen days previously allocated to Marlboro, would allow thirty-six days of racing by Marlboro. Transfer of the Hagerstown days was subject to legislative approval.

---

1. On remand, the trial court severed the limitations issue for a separate trial. At that trial a jury concluded that the O'Haras' deceit claim was not barred by limitations.

Approval at either the 1971 or 1972 session of the Maryland General Assembly would have satisfied the approval condition in the contract. H.B. 1128, enacted at the 1971 legislative session, conferred the necessary approval. On May 28, 1971, then Governor Mandel, expressing concerns about the wisdom and constitutionality of the legislation, vetoed H.B. 1128. Following the sale by the plaintiffs of their stock in Marlboro the General Assembly on January 12, 1972, overrode the veto.... In December 1972 Marlboro merged with another corporation (Bowie) which conducted horse racing with parimutuel betting at the Bowie racetrack. On November 24, 1975, the federal government filed indictments against Governor Mandel and others ... of the Kovens Group."

305 Md. at 283–85, 503 A.2d at 1314–16 (footnote omitted).[2]

Our opinion in the earlier appeal explained the theory of the plaintiffs' case to be

"that there was a conspiracy between Governor Mandel and others of the Kovens Group which antedated May 28, 1971. Plaintiffs in essence contend that the alleged conspirators planned (1) to have the Mandel veto depress the value of Marlboro stock below the price it would have commanded had H.B. 1128 been signed into law, (2) to acquire the stock at a depressed price, and then (3) to restore its value by having Governor Mandel 'himself and

---

2. The history of the prosecution on federal criminal charges is found in *United States v. Mandel*, 415 F.Supp. 997 (D.Md.1976) (summarizing indictment) and *United States v. Mandel*, 591 F.2d 1347 (4th Cir.1979) (reversing convictions), vacated upon rehearing and convictions affirmed *en banc* by evenly divided court, 602 F.2d 653 (4th Cir.1979), further rehearing *en banc* denied, 609 F.2d 1076 (4th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).

. These federal convictions were ultimately invalidated on writ of error coram nobis. *See United States v. Mandel*, 672 F.Supp. 864 (D.Md.1987), *aff'd*, 862 F.2d 1067 (4th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989). Based upon the federal convictions, Governor Mandel had been disbarred by this Court. *See Attorney Grievance Comm'n v. Mandel*, 294 Md. 560, 451 A.2d 910 (1982). After his conviction was vacated, he was reinstated as a member of the bar of this Court.

through his agents' induce the General Assembly to override the veto."

*Id.* at 286, 503 A.2d at 1316. On that previous appeal the only issue related exclusively to the limitations defense. We were not presented any issues concerned "with the sufficiency of any undisputed facts to prove any element of plaintiffs' deceit theory, or whether any alleged facts, if proved, would establish a cause of action." *Id.*

After our remand Governor Mandel moved for summary judgment on the ground of absolute immunity. The trial court denied that motion. Governor Mandel noted an appeal to the Court of Special Appeals and sought a stay which that court granted. He also petitioned this Court for certiorari. We issued the writ prior to any determination on the merits by the Court of Special Appeals in order to decide this question of public importance.

■ The parties agree that a Governor of Maryland, if performing gubernatorial duties involving the exercise of discretion, enjoys a degree of public official immunity. They disagree over whether an absolute or qualified immunity applies here. An absolute immunity from tort liability "stands even if the official acts in bad faith, or with malice or corrupt motives." *Prosser & Keeton on Torts,* § 132, at 1057 (5th ed. 1984) (footnote omitted) (Prosser). "[Q]ualified immunity is usually destroyed by 'malice,' bad faith or improper purpose[.]" *Id.* at 1059–60 (footnotes omitted).

■ Absolute "immunity protects both judges and legislators, so long as their acts are 'judicial' or legislative in nature and within the very general scope of their jurisdiction." Prosser at 1056–57 (footnotes omitted). And *see* Restatement (Second) of Torts § 895D, comment *c,* at 412 (1977) (a judge or a legislator "is not liable for [that official's] discretionary acts or omissions even though [the official] is found to have acted with malicious or other improper motives"). "The policy is to free the officer from the necessity of submitting [the officer's] purposes, motives and beliefs to the uncertain appraisal of juries or even judges." *Id.*

Determining immunity defenses at any given point across the wide range of various duties performed by the vast numbers of officials and employees in the executive branch of federal, state and local governments is by no means as relatively clear-cut as determining legislative and judicial immunities. The Restatement's attempt at generalization is that "[a] high-level executive officer is usually accorded the same type of immunity as that given the judge and for the same reasons." § 895D, comment *d*, at 413. The high-level executive must feel free to make discretionary decisions "without being subject to influence by the threat of a harassing suit." *Id.* Immunity "is not confined to the executive officials who are at the highest level." *Id.* There are many situations, some giving rise to absolute immunity, others qualified immunity and still others only a defense based on reasonableness of the decision. *Id.* at 413–15. Prosser's attempt at generalization is that, in most states, officials and employees of the executive department, with respect to state law claims against them, "enjoy no immunity at all for ministerial acts and only a qualified immunity on matters calling for the officer's discretion." Prosser, at 1059 (footnote omitted).

In the case before us Governor Mandel attempts to avoid the thicket which is the law of immunities resting solely on executive department duties. One of his arguments is that the veto/approval function is a legislative function, so that a Maryland Governor is protected civilly in that function by an absolute immunity, as are legislators.

We also granted certiorari on whether the order denying the motion for summary judgment is appealable. It is. We shall first explain our resolution of the immunity questions and then appealability.

## I

### A

The decisions of this Court neither compel nor foreclose the conclusion that a Governor of Maryland has an absolute

civil immunity when vetoing or approving legislation. The occasion to consider that issue simply has not arisen. But some discussion of absolute versus qualified immunity for executive department officials of lesser rank than Governor does appear in our cases.

When a mayor of Baltimore City ordered a painting removed from a municipal museum, the artist sued the mayor alleging, *inter alia,* interference with contractual relations, libel and slander. The mayor argued absolute immunity or privilege, and the trial court sustained a demurrer. In *Walker v. D'Alesandro,* 212 Md. 163, 129 A.2d 148 (1957), this Court, speaking through Chief Judge Brune, said:

> "The basis for immunity from liability by reason of privilege is that a public or social interest is to be served by according the privilege; and as Professor Prosser observes ([*Prosser, Torts* (2d ed. 1955)], § 16), 'The sliding scale by which the law balances the interests of the parties to accomplish a social purpose is nowhere better illustrated than in the field of privilege.' An absolute privilege is accorded to judicial proceedings and to legislative proceedings and to the activities of high executive officers.... As to executive officers, see *Spalding v. Vilas,* 161 U.S. 483 [16 S.Ct. 631, 40 L.Ed. 780] (U.S. Postmaster General) and *Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892 (State Attorney General)."

*Id.* at 169–70, 129 A.2d at 151. The Court assumed, without holding, that an absolute privilege would be accorded to the holder of the office of Mayor of Baltimore City, but concluded "that none of the acts complained of ... are within the actual field of the defendant's powers or duties as Mayor or so closely related thereto as to be entitled to an absolute privilege...." *Id.* at 173, 129 A.2d at 153.

A contrast between federal law at the time and Maryland law was presented in *Carr v. Watkins,* 227 Md. 578, 177 A.2d 841 (1962). The plaintiff had been discharged from his job as a security guard at a shopping center allegedly because of untrue, derogatory information communicated to

the employer by the defendants. One defendant was a security officer at the Naval Ordinance Laboratory where the plaintiff had previously worked, and the two remaining defendants were Montgomery County police officers. The suit alleged, *inter alia*, slander, invasion of privacy and malicious interference with contract. The action was dismissed on demurrer, and this Court reversed. Federal law controlled the claim against the federal security officer, and that law "predicated immunity on whether the act complained of was within the scope of the official's duties rather than [on] the official's rank in the governmental hierarchy." 227 Md. at 584, 177 A.2d at 844 (footnote omitted). Determining the federal officer's duties required evidence. As to the Montgomery County police officers, the Court said:

"[T]his Court has shown reluctance to extend absolute privilege or immunity from liability for torts to government officers of a higher rank than these defendants. *Walker v. D'Alesandro*, 212 Md. 163 [129 A.2d 148]; *Maurice v. Worden*, 54 Md. 233[.]"

*Id.* at 585, 177 A.2d at 844–45.[3]

The defendants in *Eliason v. Funk*, 233 Md. 351, 196 A.2d 887 (1964), were the Chairman of the State Roads Commission and the Commissioner of State Personnel. They had allegedly conspired to cause the plaintiff's discharge from state classified service, with one defendant placing charges against the plaintiff and the other accepting perjured testimony at an administrative hearing. This Court noted holdings "that judges have an absolute privilege from suits arising out of their judicial acts," and that "[p]rosecutors in judicial hearings are afforded the same privilege." *Id.* at 356, 196 A.2d at 889–90. The Court recognized that "[t]he Maryland cases seem to indicate that discretionary action will be protected only in the absence of malice." Touching upon a functional approach to immunity,

---

3. *Maurice v. Worden*, 54 Md. 233 (1880), was a libel claim against the Superintendent of the United States Naval Academy.

the Court said: "But the instant case is much closer factually to the cases dealing with judicial actions, where there is a right to review, than to the discretionary acts of law enforcement officers." *Id.* at 356–57, 196 A.2d at 890. It was unnecessary, however, to hold that the privilege was absolute in *Eliason* because the complaint failed to allege facts sufficient to permit even an inference of bad faith or malice.

*Robinson v. Board of County Comm'rs for Prince George's County,* 262 Md. 342, 278 A.2d 71 (1971), was an action for false arrest and battery against two police officers and the county which employed them. The police officers had prevailed with an immunity defense but this Court reversed, holding that the defense had not been raised by the proper procedure. Anticipating that the proper procedure would be used on remand, this Court gave guidance to the trial court. After referring to the refusal in *Carr v. Watkins, supra,* to move toward absolute privilege as then applied by the Supreme Court, this Court concluded:

"We think our own rule is sound. Indeed we can not think of any reason why a public official should not be held responsible for his malicious actions even though he claims they were done within the scope of his discretionary authority. Other jurisdictions have so held, Prosser, *supra* at 1016, and we do so here."

262 Md. at 348, 278 A.2d at 74.

None of the executive official, civil immunity cases to come before this Court, however, has dealt with the Governor, and, thus, none has dealt with that official's relations with the General Assembly.

Public official immunity invoked by a legislator in defense of criminal charges was considered in *Blondes v. State,* 16 Md.App. 165, 294 A.2d 661 (1972), an opinion authored for the court by Chief Judge Murphy. Blondes, a member of the House of Delegates, had been convicted of bribery. The conviction was reversed because of violations of Maryland Declaration of Rights, art. 10 ("That freedom of speech

and debate, or proceedings in the Legislature, ought not to be impeached in any Court of Judicature.") and of Maryland Constitution, art. III, § 18 ("No Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate."). Under interpretations of the speech and debate clause of the federal constitution in *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966) and in *United States v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), the trial court should have precluded the prosecution from proving certain parliamentary motions and votes by Blondes in a county delegation caucus even though they were on an issue as to which Blondes had accepted a fee to represent private interests.

One of the decisions arising out of the criminal prosecution of Governor Mandel points out that legislative immunity is a common law doctrine which is broader than the literal wording of provisions in the federal or state constitutions guaranteeing freedom of speech and debate. *See United States v. Mandel*, 415 F.Supp. 1025, 1027 (D.Md. 1976). "[I]n cases where particular speech or debate provisions were not applicable to protect conduct arising in the legislative context, courts have applied the common law doctrine of legislative immunity as a part of the judicially-created doctrine of official immunity." *Id.* at 1028. Indeed, "[a]bsolute legislative privilege dates back to at least 1399." *Barr v. Matteo*, 360 U.S. 564, 579, 79 S.Ct. 1335, 1343, 3 L.Ed.2d 1434, 1446 (1959) (Warren, C.J., dissenting) (footnote omitted).

## B

For at least the past two decades in the United States the principal vehicles for developing law concerning public official immunity have been actions under 42 U.S.C. § 1983 (1982).[4] The Supreme Court has said that "§ 1983 is to be

---

**4.** 42 U.S.C. § 1983 (§ 1 of the Civil Rights Act of 1871, 17 Stat. 13) reads:

read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128, 136 (1976). Thus, § 1983 cases and their first cousins, tort actions based directly on certain alleged violations of the United States Constitution by officials of the federal government, see *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), may be persuasive authority as to the Maryland common law of public official immunity in a state law, nonconstitutional tort action against a state official, as presented here.

With respect to federal law claims against state or federal officials, public official immunity has undergone some change when viewed from an historical perspective. Judges, when performing judicial functions, and legislators, when performing legislative functions, enjoyed and continue to enjoy an absolute immunity. Previously, high officials in the executive department enjoyed an absolute immunity. Currently, however, there is a "federal retreat from absolute immunity in its most stringent form[.]" Prosser § 132, at 1062. Whether an official of the executive department enjoys a § 1983 immunity, and whether that immunity is absolute or qualified, is determined in relation to the function which gives rise to the federal law claim.

An absolute immunity under § 1983 for state legislators "acting in the sphere of legitimate legislative activity" was recognized in *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019, 1027 (1951). It was an action for damages against the members of the California Senate Fact–Finding Committee on Un–American Activities. The

---

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

plaintiff alleged that he had been summoned to testify before that committee in order to be used as a tool to "smear" as a "Red" a candidate for mayor of San Francisco. In explaining the absolute nature of the immunity, Justice Frankfurter said for the Court:

"The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in Fletcher v. Peck, 6 Cranch 87, 130, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned."

341 U.S. at 377, 71 S.Ct. at 788.

Absolute immunity of state judges in § 1983 actions was recognized in *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). And *see Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872).

Immunity for executive department officials was considered in *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896). That case recognized an absolute immunity for the Post Master General in a libel action resulting from a notice sent by that official to certain local postmasters describing the operation of a federal statute. The Court said that the postmaster

"cannot be held liable to a civil suit for damages on account of official communications made by him pursuant to an act of Congress, and in respect of matters within his authority, by reason of any personal motive that might be alleged to have prompted his action; for, personal mo-

tives cannot be imputed to duly authorized official conduct."

161 U.S. at 498, 16 S.Ct. at 637.

*Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, reaffirmed *Spalding v. Vilas, supra. Barr* was a defamation action against the acting Director of the Office of Rent Stabilization. The plurality opinion in *Barr* quoted and applied the frequently repeated reasoning by Judge Learned Hand from *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

" 'It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .

" 'The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him....' "

*Barr v. Matteo,* 360 U.S. at 571–72, 79 S.Ct. at 1339–40.

The Supreme Court case marking the beginning of "the retreat," Prosser § 132, from absolute immunity in § 1983 cases is *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), involving a state governor. Based upon the deployment of the Ohio National Guard at Kent State University in May 1970, and upon events which followed that deployment, § 1983 suits were brought against the Governor, the Adjutant General, his assistant, various officers and enlisted members of the Ohio National Guard and the president of Kent State University. The complaints in essence alleged

"that each of the named defendants, in undertaking [their] actions, acted either outside the scope of his respective office or, if within the scope, acted in an arbitrary manner, grossly abusing the lawful powers of office."

416 U.S. at 235, 94 S.Ct. at 1686. The District Court dismissed the complaints before answer.

The Supreme Court noted that official immunity apparently rests on two rationales, (1) the injustice of subjecting to liability an officer who is legally required to exercise discretion, particularly absent bad faith, and (2) the danger of deterring willingness to exercise judgment with decisive-

ness posed by the threat of liability. *Id.* at 240, 94 S.Ct. at 1688. The Court reaffirmed its prior holdings concerning judicial and legislative absolute immunity. The Court then analogized the Governor's exercise of discretion in dealing with civil disorder to possible arrest situations confronted by police officers. The " 'common law has never granted police officers an absolute and unqualified immunity[.]' " Id. at 245, 94 S.Ct. at 1691 (quoting *Pierson v. Ray,* 386 U.S. at 555, 87 S.Ct. at 1218). Although good faith and probable cause are the guidelines for evaluating police conduct relating to an arrest,

"[i]n the case of higher officers of the executive branch, however, the inquiry is far more complex since the range of decisions and choices—whether the formulation of policy, of legislation, of budgets, or of day-to-day decisions—is virtually infinite."

416 U.S. at 246, 94 S.Ct. at 1691. " 'It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted' " which provide the guide for the scope of immunity. *Id.* at 247, 94 S.Ct. at 1692 (quoting *Barr v. Matteo,* 360 U.S. at 573, 79 S.Ct. at 1340). In remanding for further proceedings the Court concluded:

"These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct."

416 U.S. at 247–48, 94 S.Ct. at 1692.

Two years later the Supreme Court rejected the argument that a state prosecuting attorney, "as a member of the executive branch, cannot claim the immunity reserved

for the judiciary, but only a qualified immunity akin to that accorded other executive officials in this Court's previous cases." *Imbler v. Pachtman,* 424 U.S. at 420–21, 96 S.Ct. at 990. The Court concluded that prosecutors enjoyed an absolute immunity at common law "based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties," *id.* at 422–23, 96 S.Ct. at 991, and that those same considerations of public policy countenanced absolute immunity in § 1983 actions for initiating a prosecution and presenting the case.

The meaning of *Scheuer v. Rhodes, supra,* was considerably clarified, or, at least, the apparent sweep of the opinion was considerably narrowed, in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). There the plaintiff, a commodity futures commission merchant, had been found in administrative proceedings within the Department of Agriculture to have violated certain requirements and faced a loss of registration. The administrative determination was reversed on judicial review. The plaintiff then brought a *Bivens* action against all of the officials in the Department of Agriculture who had had anything to do with the administrative proceeding. The District Court dismissed, holding that there was absolute immunity under *Barr v. Matteo, supra.* The Court of Appeals reversed, concluding that *Scheuer v. Rhodes, supra,* and other opinions "establish[ed] that officials of the Executive Branch exercising discretionary functions did not need the protection of an absolute immunity from suit...." *Butz,* 438 U.S. at 484, 98 S.Ct. at 2899. In answering the Government's argument that absolute immunity protected federal officials, even if high state officials did not enjoy the same immunity, the Court, speaking through Justice White, undertook to harmonize the precedents. The Court said that "the general rule, which long prevailed, [is] that a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." *Id.* at 489,

98 S.Ct. at 2902.[5] The Court recognized that the plurality opinion in *Barr* appeared to have extended absolute immunity, but distinguished both *Barr* and *Spalding* on the basis that neither involved the liability of officials who had exceeded constitutional limits. 438 U.S. at 495, 98 S.Ct. at 2905.[6] Absolute immunity for federal officials based on their status was rejected. Immunity in a *Bivens* case would not be greater than that accorded state officials sued for identical violations under § 1983. *Id.* at 500, 98 S.Ct. at 2907.

The *Butz* Court then used *Scheuer* to supply the governing principles for resolving the immunity defenses. That *Scheuer* analysis produced the following holding:

"[I]n a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity specified in *Scheuer*, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business."

438 U.S. at 507, 98 S.Ct. at 2911 (footnote omitted). Thus, "[a]lthough a qualified immunity from damages liability should be the general rule for executive officials charged

---

**5.** In a dissent Justice Rehnquist, speaking for three other justices as well, believed that the *Butz* "decision seriously misconstrues our prior decisions," and that "[m]ost noticeable is the Court's unnaturally constrained reading of the landmark case of *Spalding v. Vilas,* 161 U.S. 483 [16 S.Ct. 631, 40 L.Ed. 780] (1896)." *Id.* at 518, 98 S.Ct. at 2917.

**6.** The majority in *Butz* did not have to clarify the ground over which this distinction leapt, namely, the extent of the immunity of a federal executive official to a state law ordinary tort claim. The Court said:
"Accepting [*Barr's*] extension of immunity with respect to state tort claims, however, we are confident that *Barr* did not purport to protect an official who has not only committed a wrong under local law, but also violated those fundamental principles of fairness embodied in the Constitution. Whatever level of protection from state interference is appropriate for federal officials executing their duties under federal law, it cannot be doubted that these officials, even when acting pursuant to congressional authorization, are subject to the restraints imposed by the Federal Constitution."
438 U.S. at 495, 98 S.Ct. at 2917 (footnote omitted).

with constitutional violations ... *there are some officials whose special functions require a full exemption from liability." Id.* at 508, 98 S.Ct. at 2912 (emphasis added).

The Supreme Court concluded that the Court of Appeals had erred by placing

"undue emphasis on the fact that the officials sued here are—from an administrative perspective—employees of the Executive Branch. Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities."

*Id.* at 511, 98 S.Ct. at 2913. Consequently, *Butz* held that all of the Department of Agriculture officials who had participated in the decision to initiate the administrative prosecution, and the attorney who had presented the case, had absolute immunity because their functions were analogous to that of a prosecutor, so that *Imbler v. Pachtman, supra,* controlled. The administrative law judges and hearing officers enjoyed the same absolute exemption as do judges in a court of law.

This approach to immunity law is a " 'functional' " one. *Harlow v. Fitzgerald,* 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396, 406 (1982). "The scope of immunity is determined by function, not office." *Nixon v. Fitzgerald,* 457 U.S. 731, 785, 102 S.Ct. 2690, 2719, 73 L.Ed.2d 349, 386 (1982) (White, J., dissenting). Under this approach members of an interstate planning agency have been held to have absolute immunity from § 1983 liability for damages for harm allegedly caused by adopting a land use ordinance and general plan because these were actions taken by those officials in their legislative capacities. *See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). That case confirmed the view expressed by the United States District Court for the District of Maryland in 1976 in *United States v. Mandel,* 415 F.Supp. at 1028, that absolute immunity for state legislators, as recognized in *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, is not restricted to the scope of

the speech or debate clauses expressed in the federal and in state constitutions. *Tahoe*, 440 U.S. at 404, 99 S.Ct. at 1178. "Rather, the rule of [*Tenney*] recognizes the need for immunity to protect the 'public good.'" *Tahoe*, 440 U.S. at 404–05, 99 S.Ct. at 1179.

Similarly, if a state supreme court is acting legislatively, it enjoys an absolute legislative immunity from § 1983 damages. *See Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980).

## C

Here the function involved is the exercise of the power to veto or approve legislation. *See* Maryland Constitution, art. II, § 17.[7] "[A]s a matter of historical development as well

---

**7.** Maryland Constitution, art. II, § 17 reads as follows:

"(a) To guard against hasty or partial legislation and encroachment of the Legislative Department upon the co-ordinate Executive and Judicial Departments, every Bill passed by the House of Delegates and the Senate, before it becomes a law, shall be presented to the Governor of the State. If the Governor approves he shall sign it, but if not he shall return it with his objections to the House in which it originated, which House shall enter the objections at large on its Journal and proceed to reconsider the Bill. Each House may adopt by rule a veto calendar procedure that permits Bills that are to be reconsidered to be read and voted upon as a single group. The members of each House shall be afforded reasonable notice of the Bills to be placed on each veto calendar. Upon the objection of a member, any Bill shall be removed from the veto calendar. If, after such reconsideration, three-fifths of the members elected to that House pass the Bill, it shall be sent with the objections to the other House, by which it shall likewise be reconsidered, and if it passes by three-fifths of the members elected to that House it shall become a law. The votes of both Houses shall be determined by yeas and nays, and the names of the persons voting for and against the Bill shall be entered on the Journal of each House respectively.

"(b) If any Bill presented to the Governor while the General Assembly is in session is not returned by him with his objections within six days (Sundays excepted), the Bill shall be a law in like manner as if he signed it, unless the General Assembly, by adjournment, prevents its return, in which case it shall not be a law.

"(c) Any Bill presented to the Governor within six days (Sundays excepted), prior to adjournment of any session of the General Assembly, or after such adjournment, shall become law without the

as of theory ... the veto is a legislative power." E. Mason, *The Veto Power* § 100 (A. Hart ed. 1967).

*People v. Bowen*, 21 N.Y. 517 (1860), presented a clear exposition of the political theory underlying veto power. *Bowen* held that the power to approve and sign a bill presented to the Governor of New York within a specified number of days prior to adjournment of the legislature does not cease with the adjournment. The court said:

"Whatever the authority, touching the enactment of laws, with which the Governor is clothed, shall be called, it is of the same general nature with that which is exercised by the members of the two houses. He is to consider as to the constitutionality, justice and public expediency of such legislative measures as shall have been agreed upon by the two houses, by the ordinary majorities, and be presented to him; and he is to accord or withhold his approbation, according to the result of his deliberation. This is plainly the function of a legislator. The sovereign of England, who is charged with the same duty in respect to acts of Parliament, is considered to be a constituent part of the supreme legislative power. (1 Bl.Com., 261.)

---

Governor's signature unless it is vetoed by the Governor within 30 days after its presentment.

"(d) Any Bill vetoed by the Governor shall be returned to the House in which it originated immediately after the House has organized at the next regular or special session of the General Assembly. The Bill may then be reconsidered according to the procedure specified in this section. Any Bill enacted over the veto of the Governor, or any Bill which shall become law as the result of the failure of the Governor to act within the time specified, shall take effect 30 days after the Governor's veto is over-ridden, or on the date specified in the Bill, whichever is later. If the Bill is an emergency measure, it shall take effect when enacted. No such vetoed Bill shall be returned to the Legislature when a new General Assembly of Maryland has been elected and sworn since the passage of the vetoed Bill.

"(e) The Governor shall have power to disapprove of any item or items of any Bills making appropriations of money embracing distinct items, and the part or parts of the Bill approved shall be the law, and the item or items of appropriations disapproved shall be void unless repassed according to the rules or limitations prescribed for the passage of other Bills over the Executive veto."

It is true that his determination to disapprove a bill deprives it of any effect; while one disallowed by the Governor may yet be established by an extraordinary concurrence of votes in the houses. Thus, though the action of the executive is less potential here than in England, the quality of the act, namely, deliberating and determining upon the propriety of laws proposed to be enacted, is precisely the same. Besides making his determination, the Governor is required, in case it is unfavorable to the law, to submit his objections to the legislature, which is to examine them, and again pass upon them in the light of the discussion which they have thus undergone. To my mind, it is clear that this involves a participation on the part of the Governor, with the two houses of the legislature, in the enactment of laws. It would not be correct language to say, that he forms a branch of the legislature, for the Constitution has limited that designation to the Senate and Assembly; but it would be equally incorrect to affirm, that the sanction which he is required to give to or withhold from bills before they can become operative does not render him a participator in the function of making laws."

*Id.* at 521–22.

This Court reached an identical holding concerning the effect of adjournment under the Maryland Constitution, in which *People v. Bowen* was cited with approval. *See Lankford v. County Comm'rs of Somerset County,* 73 Md. 105, 116, 20 A. 1017, 1020 (1890).

The Supreme Court of the United States has espoused the same theory as to the veto power of the President of the United States, see *Edwards v. United States,* 286 U.S. 482, 490, 52 S.Ct. 627, 630, 76 L.Ed. 1239, 1243 (1932) ("The fact that [the President's function in approving or disapproving bills] is a legislative function does not mean that it can be performed only while Congress is in session."), and as to state governors, see *Smiley v. Holm,* 285 U.S. 355, 370, 52 S.Ct. 397, 400, 76 L.Ed. 795, 802 (1932) ("[T]he uniform practice ... has been to provide for congressional districts

by the enactment of statutes with the participation of the Governor wherever the state constitution provided for such participation as part of the process of making laws.").

Among state decisions which concur in the theory are *Parkinson v. Johnson,* 160 Cal. 756, 117 P. 1057 (1911); *Lukens v. Nye,* 156 Cal. 498, 105 P. 593 (1909); *Colorado Gen. Assembly v. Lamm,* 704 P.2d 1371 (Colo.1985) (en banc); *Stong v. People ex rel. Curran,* 74 Colo. 283, 220 P. 999 (1923); *State ex rel. Brassey v. Hanson,* 81 Idaho 403, 342 P.2d 706 (1959); *Williams v. Kerner,* 30 Ill.2d 11, 195 N.E.2d 680 (1963); *Arnett v. Meredith,* 275 Ky. 223, 121 S.W.2d 36 (1938); *Cammack v. Harris,* 234 Ky. 846, 29 S.W.2d 567 (1930); *United Ins. Co. v. Attorney General,* 300 Mich. 200, 1 N.W.2d 510 (1942); *State v. Atterbury,* 300 S.W.2d 806 (Mo.1957) (en banc); *City of Long Beach v. Public Serv. Comm'n,* 249 N.Y. 480, 164 N.E. 553 (1928); *Peebly v. Childers,* 95 Okla. 40, 217 P. 1049 (1923); *Ex parte Benight,* 11 P.2d 208 (Okla.Crim.App.1932); *Commonwealth v. Barnett,* 199 Pa. 161, 48 A. 976 (1901); *Doran v. Robertson,* 203 S.C. 434, 27 S.E.2d 714 (1943); *Teem v. State,* 183 S.W. 1144 (Tex.Crim.App.1916); *Lynch v. State,* 19 Wash.2d 802, 145 P.2d 265 (1944); *Gottstein v. Lister,* 88 Wash. 462, 153 P. 595 (1915).

E. Mason, *The Veto Power, supra,* § 100 explains that "the President acts as a part of the law-making power when he approves or disapproves an act," in like manner as "the Senate, in impeachments, is a judicial and not a legislative body." Other scholars agree. *See* C. Black, Jr., *Some Thoughts on the Veto,* 40 Law & Contemp.Probs. 87, 88 (1976); H. Black, *Handbook of American Constitutional Law,* at 97 (2d ed. 1897); Clineburg, *The Presidential Veto Power,* 18 S.C.L.Rev. 732, 738 (1966); T. Cooley, *The General Principles of Constitutional Law in the United States of America,* at 51 (3d ed. 1898); T. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union,* at 187 (6th ed. 1890); L. Tribe, *American Constitutional Law* § 2–2, at 19 (2d ed. 1988); W. Wilson, *Congressional*

*Government: A Study in American Politics*, at 52 (1885) ("For in the exercise of his power of veto, which is of course, beyond all comparison, his most formidable prerogative, the President acts not as the executive but as a third branch of the legislature.").

## D

The O'Haras' tort claim is unusual in that the tortious conduct attributed to the appellant is the vetoing of specific legislation for the purpose of defrauding the O'Haras and other Marlboro stockholders. Governor Mandel's immunity argument lies at the point of intersection or overlap between executive and legislative powers. We confine our holding to that point of intersection.

Writing in 1932, without benefit of any case law but reasoning from first principles, the author of *Cooley on Torts* concluded that a Governor would be absolutely immune if sued for a tort based on the exercise of a veto.

"No one has any legal right to be pardoned, or to have any particular law signed by the governor, or to have any definite step taken by the governor in the enforcement of the laws. The executive, in these particulars, exercises his discretion, and he is not responsible to the courts for the manner in which his duties are performed. Moreover, he could not be made responsible to private parties without subordinating the executive department to the judicial department, and this would be inconsistent with the theory of republican institutions."

2 Cooley, *Law of Torts* § 298 (4th ed. 1932).

In *Saffioti v. Wilson*, 392 F.Supp. 1335 (S.D.N.Y.1975), the plaintiff alleged that one of the defendants, the Governor of New York, had denied the plaintiff due process of law by vetoing a private bill enacted by the New York Assembly which would have permitted the plaintiff to assert a time barred claim in the New York Court of Claims. The Southern District ruled against the plaintiff on the

merits but suggested that the suit could have been dismissed on grounds of legislative immunity.[8]

In the federal criminal prosecution against him, Governor Mandel raised a defense of legislative immunity which the court rejected. The rationale of that rejection was limited to immunity from criminal prosecution. *See United States v. Mandel*, 415 F.Supp. at 1031 n. 8 ("The Court, of course, expresses no opinion as to the applicability of the doctrine of legislative immunity in any other context other than that presented by the present case.").

In 1981 the United States Court of Appeals for the Fifth Circuit handed down the only decision disclosed by our research and that of counsel which squarely adjudicates whether an executive enjoys absolute legislative immunity from damages for an alleged tort which is based upon the exercise of veto power. *Hernandez v. City of Lafayette*, 643 F.2d 1188, *reh'g denied*, 649 F.2d 336 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982) holds that absolute legislative immunity applies in a § 1983 action. There the plaintiff owned land through which the municipality planned to build a highway. The city council unanimously had rezoned that land, but the mayor vetoed the measure. The council did not override the veto. The plaintiff alleged that the municipal officials had delayed making a decision on the rezoning in order to maintain the depressed market value of the land and thereby to minimize the cost of acquiring the right of way for the highway. The Fifth Circuit first held that legislative immunity could apply to local legislators in § 1983 actions. It then affirmed judgment in favor of the mayor.

---

**8.** The court said:

"Lastly, in view of the settled principle that '[i]n exercising the veto power ... the executive is exercising a legislative power.' Fitzsimmons v. Leon, 141 F.2d [886, 888 (1st Cir.1944)], that is, in acting with respect to matters presented by the legislature, a governor acts *qua* legislator, in a law making capacity, rather than *qua* executive, in a law executing role, his conduct might be found to be within the scope of legislative immunity as well."
392 F.Supp. at 1344 n. 10.

"Although the mayor of the City of Lafayette is the elected chief executive officer of the city, he is entitled to absolute immunity from suit for acts taken in a legislative capacity. *See Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 731–34, 100 S.Ct. 1967, 1974–75, 64 L.Ed.2d 641 (1980). We conclude that when the mayor of a municipality vetoes an ordinance passed by the city's legislative body, he performs a legislative function and is entitled to absolute immunity from a civil suit complaining about actions taken in his legislative capacity. ...

"The mayor's veto, like the veto of the President or a state governor, is undeniably a part of the legislative process. It differs only in that it takes place on the local level. When the mayor exercises his veto power, it constitutes the policy-making decision of an individual elected official. It is as much an exercise of legislative decision-making as is the vote of a member of Congress, a state legislator, or a city councilman."

643 F.2d at 1193–94 (footnote omitted).

The holding of *Hernandez* that there is absolute legislative immunity under § 1983 for local legislative action (resting as it does on treating the executive veto as legislative action) has been followed by other federal courts. *See Shoultes v. Laidlaw,* 886 F.2d 114, 117 (6th Cir.1989); *Healy v. Town of Pembroke Park,* 831 F.2d 989, 993 (11th Cir.1987); *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 577 n. 22 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985); *Cutting v. Muzzey,* 724 F.2d 259, 262 (1st Cir.1984); *Aitchison v. Raffiani,* 708 F.2d 96, 99 (3d Cir.1983); *Reed v. Village of Shorewood,* 704 F.2d 943, 952 (7th Cir.1983); *Goldberg v. Village of Spring Valley,* 538 F.Supp. 646, 648 (S.D.N.Y.1982); *Searingtown Corp. v. Incorporated Village of North Hills,* 575 F.Supp. 1295, 1296 (E.D.N.Y.1981); *cf. Schultz v. Sundberg,* 577 F.Supp. 1491 (D.Alaska 1984) (governor has qualified immunity in § 1983 suit alleging constitutional deprivation by calling special session of legislature for which the plaintiff

legislator was bodily attached to achieve quorum on order of presiding officer), *aff'd*, 759 F.2d 714 (9th Cir.1985).

## E

The O'Haras submit that the conclusion of absolute immunity which follows from the analysis set forth in sections I A—I D should not be adopted for a number of reasons.

## 1

The O'Haras say that "[i]t is not the Governor's veto of House Bill 1128, standing alone that comprises the gravamen of the claim against him in this case. Rather, it is his participation in the overall conspiracy to defraud...." Brief of Appellees at 26. Under the allegations of this complaint, there is no difference. It alleges that Governor Mandel vetoed House Bill 1128 "with the intent and the knowledge that his veto would depress the value of the stock of Marlboro Race Track and would deceive and defraud plaintiffs ... about the value of their stock and the price they could expect to obtain for the stock for sale on the open market." The participation attributed to Governor Mandel in the alleged conspiracy is essential to any injury complained of by the plaintiffs, as well as to any computation of damages. Had Governor Mandel approved House Bill 1128 any negotiations by the O'Haras for the sale of their stock would have been for stock in a corporation entitled to, or to the use of, the additional racing days.

Indeed, in *O'Hara v. Kovens*, 305 Md. 280, 503 A.2d 1313, we interpreted this same complaint to make the state of mind of Governor Mandel prior to the veto critical to the claim. *Id.* at 302, 503 A.2d at 1324. It was *only* because there were conflicting factual inferences whether a conspiracy antedated the veto and whether the reasons publicly given for the veto represented Governor Mandel's true reasons for the veto that the complaint escaped dismissal as a matter of law on limitations grounds. *Id.* at 302–03, 503 A.2d at 1324. We shall not permit the plaintiffs now to minimize the role of the veto in their theory of the case

after they have made critical use of the veto to avoid the defense of limitations raised by all members of the Kovens Group.

2

Treating a veto as legislative action by the Governor, the O'Haras submit, would violate the doctrine of separation of powers, particularly as embodied in Maryland Declaration of Rights, art. 8.[9]

The argument overstates the separation of powers concept. In No. 66 of the Federalist Papers, Alexander Hamilton refuted a similar objection to the trial of impeachments in the Senate.

"The *first* of these objections is that the provision in question confounds legislative and judiciary authorities in the same body in violation of that important and well-established maxim which requires a separation between the different departments of power. The true meaning of this maxim has been discussed and ascertained in another place, and has been shown to be entirely compatible with a partial intermixture of those departments for special purposes, preserving them, in the main, distinct and unconnected. This partial intermixture is even, in some cases, not only proper but necessary to the mutual defense of the several members of the government against each other. An absolute or qualified negative in the executive upon the acts of the legislative body is admitted, by the ablest adepts in political science, to be an indispensable barrier against the encroachments of the latter upon the former."

A. Hamilton, J. Madison, & J. Jay, *The Federalist Papers*, at 401–02 (The New American Library ed. 1961).

---

9. Article 8, Maryland Declaration of Rights, provides:
"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

3

Relying on *England v. Rockefeller,* 739 F.2d 140, *overruled on other grounds Young v. Lynch,* 846 F.2d 960, 962 (4th Cir.1984), the O'Haras argue that even a governor cannot assert absolute legislative immunity, at least for § 1983 purposes, unless that official exercises all of the state's legislative power on the subject matter at issue. In the action against Governor Rockefeller of West Virginia former employees of the state highway agency contended that they had been discharged for political reasons. They alleged that the governor had deliberately inflated revenue estimates for fiscal year 1981 to justify excessive expenditures and then utilized the ensuing deficit as an excuse to terminate the plaintiffs. Rejecting an absolute legislative immunity defense, the Fourth Circuit said:

> "Legislative immunity attaches to the acts of state executive branch officers only when they are exercising the state's 'entire legislative power with respect to' the matter at issue. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 734 [100 S.Ct. 1967, 1975]. ... Although the Governor of West Virginia is intimately involved in the state's budget process, his participation clearly does not qualify for legislative immunity under *Supreme Court of Virginia.* The West Virginia Constitution requires the Governor to submit a detailed budget bill to the legislature.... The legislature may amend the bill ... but the Governor has an item veto over the bill as finally passed, which can be overridden on an item-by-item basis only by a two-thirds vote in each house. ... Thus his responsibilities regarding the budget, though considerable, clearly fall short of an exercise of the state's entire legislative power to appropriate monies."

739 F.2d at 142–43.

We do not read *Consumers Union* as narrowly as did the Fourth Circuit in *Rockefeller.* In *Consumers Union* a Virginia statute provided that the Supreme Court of Virginia "may, from time to time, prescribe, adopt, promulgate and amend rules and regulations ... [p]rescribing a code of

ethics governing the professional conduct of attorneys-at-law...." Virginia Code (1950, 1978 Repl. Vol.), § 54–48(b). Consumers Union argued that the Supreme Court of Virginia was "merely exercising a delegated power to make rules in the same manner that many executive and agency officials wield authority to make rules in a wide variety of circumstances." 446 U.S. at 734, 100 S.Ct. at 1976. The Supreme Court conceded that *"[a]ll* of such officials" are not absolutely immune but said that "it would not follow that ... in *no* circumstances do those who exercise delegated legislative power enjoy legislative immunity." *Id.* (emphasis in original). It is in that context that the Court then went on to say that

> "[i]n any event, in this case the Virginia Court claims inherent power to regulate the Bar, and ... the Virginia Court is exercising the State's entire legislative power with respect to regulating the Bar, and its members are the State's legislators for the purpose of issuing the Bar Code."

*Id.* Thus, the Court's reference to a state's entire legislative power was simply to point out that the case was clearly one for absolute legislative immunity. The reference is not a requirement that all legislative power be delegated as a condition precedent to the delegatee's enjoying legislative immunity. *Consumers Union* expressly recognizes that absolute legislative immunity may arise with lesser delegations.

An example of a lesser delegation is *Jayvee Brand, Inc. v. United States,* 721 F.2d 385 (D.C.Cir.1983). The plaintiffs, manufacturers of children's sleepwear, sued the then current and former members of the Consumer Product Safety Commission in a *Bivens* action alleging a denial of due process in adopting regulations in 1974 which approved treating fabric with a certain flame-retardant compound and then in 1977 prohibiting use of that same compound. The District of Columbia Court of Appeals held that the defendants enjoyed absolute legislative immunity in exercising quasi-legislative regulatory authority. The court relied on

*Consumers Union* together with *Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171.

Further, the *Rockefeller* court's analysis finds that the West Virginia budget process divided power between the Governor and the Legislature. If exercise of a state's entire legislative authority on a given subject is required for legislative immunity, then legislators themselves would never have immunity in any state in which legislative power is shared under a constitutional requirement that the Governor either sign or veto legislative enactments.

In any event, we decline to adopt the *Rockefeller* court's limited view of legislative immunity as part of Maryland law. This is particularly because of the adverse ramifications that that rule would have on gubernatorial decision-making in preparing the executive budget under Maryland Constitution, art. III, § 52. *Cf. Kelly v. Marylanders for Sports Sanity,* 310 Md. 437, 453, 530 A.2d 245, 253 (1987) (prior to Budget Amendment "the power to expend public monies was vested solely in the Legislature").

4

The Budget Amendment, adopted in 1916, and the veto provision, adopted in 1867, are more particular and more recent guides for formulating Maryland common law than are the general and essentially precatory provisions of Maryland Declaration of Rights, art. 6, adopted in 1776.[10] Hence we decline the O'Haras' invitation to use art. 6 as our polestar.

---

**10.** Maryland Declaration of Rights, art. 6, reads:
"That all persons invested with the Legislative or Executive powers of Government are the Trustees of the Public, and, as such, accountable for their conduct: Wherefore, whenever the ends of Government are perverted, and public liberty manifestly endangered, and all other means of redress are ineffectual, the People may, and of right ought, to reform the old, or establish a new Government; the doctrine of non-resistance against arbitrary power and oppression is absurd, slavish and destructive of the good and happiness of mankind."

The O'Haras contend that no absolute immunity of any kind can apply to action taken by a public official for the purpose of defrauding persons. This argument is, in substance, a denial of absolute immunity. Whether a function qualifies for absolute immunity is made objectively and not subjectively. *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, looked to whether the matters involved were committed by law to the public official's control or supervision. *Nixon v. Fitzgerald,* 457 U.S. 731, 756, 102 S.Ct. 2690, 2704, involving the unique absolute immunity of the President of the United States, and *Barr v. Matteo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, looked to whether the acts were within the outer perimeter of the official's responsibility. We need not define any perimeter in the case before us because the legislative veto/approval power of a Governor is at the very core of gubernatorial duties.

In *Nixon* the argument was made, similar to that presented here, that the President enjoyed no immunity from damages for the discharge of the plaintiff because the discharge lacked "such cause as will promote the efficiency of the service," a requirement imposed by 5 U.S.C. § 7512(A). The Court (plurality opinion) rejected the contention saying:

> "This construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose. Adoption of this construction thus would deprive absolute immunity of its intended effect."

457 U.S. at 756, 102 S.Ct. at 2705. And *see Tenney v. Brandhove,* 341 U.S. at 377, 71 S.Ct. at 788; *Gregoire v. Biddle,* 177 F.2d at 581; Prosser, at 1059; Restatement (Second) of Torts, comments to § 895D at 412–13.

## F

■ The discretion exercised by a Governor in deciding whether to veto or approve legislation does not differ from that to be exercised by legislators in deciding whether to

vote for or against a bill. There is no policy reason why legislators should enjoy absolute immunity for their legislative acts but that a Governor should have only a qualified immunity for his or her legislative function of vetoing or approving legislation.

For all of the foregoing reasons we hold, as a matter of Maryland common law, that a Governor of Maryland enjoys an absolute immunity from liability for damages for nonconstitutional torts based on the approval or veto of legislative enactments.[11]

## II

■ Because absolute immunity carries with it the right to avoid trial as a party defendant, review after final judgment will not protect the right. It follows that the denial of Governor Mandel's motion for summary judgment is an appealable order under the collateral order doctrine. *See Public Serv. Comm'n v. Patuxent Valley Conservation League*, 300 Md. 200, 477 A.2d 759 (1984).

From a procedural standpoint the absolute immunity asserted in this case is a defense of failure to state a claim upon which relief can be granted. That defense may be made by motion for summary judgment and, under Maryland Rule 2–324, is not waived, even if first made at trial on the merits. Thus, even though Governor Mandel did not argue in the trial court that the veto is a legislative function, it would be inefficient to remand in order to present to the trial court a pure point of law which the parties have briefed and argued in this Court. Further, because the defense is unaffected by the particular facts which might be developed, a case of this type is not one within the discretion which a trial court ordinarily has to deny summary judgment. *Compare Three Garden Village Ltd. Partner-*

---

11. Our holding, therefore, does not address criminal prosecutions, claims for equitable relief, for declaratory judgment, for restitution or for damages based on an alleged constitutional violation.

*ship v. United States Fidelity & Guaranty Co.*, 318 Md. 98, 567 A.2d 85 (1989).

ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY DENYING THE MOTION FOR SUMMARY JUDGMENT OF THE DEFENDANT, MARVIN MANDEL, REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF JUDGMENT IN FAVOR OF THE DEFENDANT, MARVIN MANDEL, ONLY. COSTS TO BE PAID BY THE APPELLEES.

THE STAY ISSUED ON JUNE 1, 1990, BY THE COURT OF SPECIAL APPEALS IS LIFTED, EFFECTIVE WITH THE FILING OF THIS OPINION.